*EXHIBIT G*

Lisa F. Laux, PhD - 4/15/2019

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

------------------------------------------------

RYSTA LEONA SUSMAN, both ) Case No. 8:18-cv-00127
individually and as Legal )
Guardian of SHANE ALLEN )
LOVELAND, et al., )
                                )
    Plaintiffs, )
                                )
    vs. )
                                )
THE GOODYEAR TIRE & )
RUBBER COMPANY, )
                                )
    Defendant. )
------------------------------------------------

DEPOSITION OF LILA F. LAUX, Ph.D.    April 15, 2019
------------------------------------------------

APPEARANCES:
    KASTER, LYNCH, FARRAR & BALL, LLP
        By Kyle W. Farrar, Esq.
           1010 Lamar Street
           Suite 1600
           Houston, Texas 77002
              Appearing on behalf of Plaintiffs.

    GREENSFELDER, HEMKER & GALE, P.C.
        By Edward S. Bott, Jr., Esq.
           10 South Broadway
           Suite 2000
           St. Louis, Missouri 63102
              Appearing on behalf of Defendant.

## Page 2

Pursuant to Notice and the Federal Rules of Civil Procedure, the deposition of LILA F. LAUX, Ph.D., called by Defendant, was taken on Monday, April 15, 2019, commencing at 1:00 p.m., at 216-16th Street, Suite 600, Denver, Colorado, before Patricia M. Wrede, Registered Professional Reporter and Notary Public within and for the State of Colorado.

                    I N D E X
DEPOSITION OF LILA F. LAUX, Ph.D.
EXAMINATION BY:                           PAGE
    Mr. Farrar                             --
    Mr. Bott                                4

## Page 3

            I N D E X (Continued)
EXHIBITS                              INITIAL REFERENCE
Exhibit 1    3-13-19 Laux Report                5
Exhibit 2    Laux Testimony List                5
Exhibit 3    Laux C.V.                          5
Exhibit 4    Laux Fee Schedules                 6
Exhibit 5    3-13-19 Laux Invoice               6
Exhibit 6    Thumb Drive - *Retained by Mr.     7
             Bott*

Exhibit 7    Deposition Notice                 42

Exhibit 8    Michelin Technical Bulletin       50

Exhibit 9    Continental Product Service       50
             Information Bulletin
Exhibit 10   Cooper Service Bulletin           50
Exhibit 11   Laux Testimony List              115

## Page 4

            P R O C E E D I N G S
    (Exhibits 1 through 6 marked.)
        LILA F. LAUX, Ph.D.,
being first duly sworn in the above cause, was
examined and testified on oath as follows:
            EXAMINATION
BY MR. BOTT:
    Q   Would you tell me your full name, please?
    A   My full name is Lila Carol Fitzgerald
Laux.
    Q   And, Doctor -- I call you Doctor.  You
hold a Ph.D., correct?
    A   I do.
    Q   Do you prefer to be referred to as Doctor
or Ms. or --
    A   Well, in professional settings I'm usually
Doctor.
    Q   All right.  Would this be a professional
setting then?
    A   I think so.
    Q   All right then.
        Dr. Laux, my name is Ed Bott.  We have not
met before today, but I represent the Goodyear Tire &
Rubber Company, and I'm going to be asking you
various questions regarding your involvement in this

1 (Pages 1 to 4)

Epiq Court Reporting Solutions - Chicago
312.386.2000

Lisa F. Laux, PhD - 4/15/2019

Page 49

1 This one says Passat and this one says
2 Jetta.
3 Q So is the Jetta owner's manual referenced
4 on Exhibit 6?
5 A Evidently not.
6 Q Is there a reason why you didn't produce
7 that to me?
8 A Human error on my part. Sorry.
9 Q With regard to your opinion 5, do you hold
10 an opinion that in fact Goodyear should have issued a
11 public service bulletin as you describe in opinion 5
12 in the year 1990?
13 A Well, it's a product service bulletin, not
14 a public service bulletin.
15 Q Thank you.
16 A And do I think they could have? Yes. Do
17 I think they should have? I don't think so, no.
18 Q All right. Do you think that Goodyear
19 should have provided a product service bulletin as
20 the kind you describe in 1995?
21 A I'm not sure when all the -- this one's
22 from Goodyear that was a product bulletin in 2006 in
23 which they said they didn't believe they needed to do
24 anything about the old tires if I recall.
25 Q So would you agree then that you're not

Page 50

1 critical of Goodyear for not issuing such a product
2 service bulletin in the year 1994?
3 A No, I'm not.
4 Q All right. As we look at the other
5 product service bulletins that you mention -- and I
6 think these had been provided to me.
7 A The Service Life for Passenger Car from
8 Cooper, 2006?
9 Q Yeah, I'm just going to run through --
10 A There are some others.
11 Q Let me mark all of these right now. We
12 might reference them later. There's --
13 A They're almost all 2006.
14 Q I have three of them here.
15     (Exhibits 8 through 10 marked.)
16 Q (By Mr. Bott) Doctor, Exhibits 8, 9 and 10
17 are product service bulletins or technical bulletins
18 that were provided to me in advance of your
19 deposition, and I believe all of these are on
20 Exhibit 6, although I may have -- I didn't have a lot
21 of time to compare so maybe I missed something.
22     Exhibit 8 is from Michelin, and it's dated
23 February 9, 2006, correct?
24 A Yep, that's the date.
25 Q Continental is Exhibit 9, and that's dated

Page 51

1 February 2006, correct?
2 A It is.
3 Q Exhibit 10 is Cooper, and I don't see a
4 date on the Cooper document. Do you happen to know?
5 A Let me see if I have it. Mine says 2006,
6 Light Truck and Full-Size Spare Tire Service
7 Bulletin. It says 2006 in the reference. Service
8 Life for Passenger Car, Light Truck and Full-Size
9 Spare Tires. Yes.
10 Q Okay. So the product service bulletins
11 that you're aware of from other manufacturers would
12 be these three that we just identified?
13 A Well, these three, and I think I have
14 others. Let's see what else I've referenced in here.
15     I have one from the Japan Automotive Tyre
16 Manufacturers Association, Cooper, Michelin,
17 Continental, Cooper, Firestone, and then over here,
18 this is Cooper too.
19     So these are the ones I referenced, yes.
20 Q Is the Japanese reference on Exhibit 6?
21 A It's not, and, you know, it's not properly
22 referenced in here either. It just says Japan
23 Automotive Tyre Manufacturers Association. So I'm
24 not sure which one it is.
25 Q So that would be one that I couldn't even

Page 52

1 find if I tried to search for it.
2 A Oh, yeah, you could.
3 Q Well, you said -- I thought you said it's
4 not properly referenced?
5 A Well, it gives you the name of the Japan
6 Automotive Tyre Manufacturers Association, and you
7 can go in there and look for tire service bulletin
8 and you'll find it.
9 Q So these product service bulletins on
10 aging were first issued evidently in 2006.
11 A Correct.
12 Q And so then is it your opinion that in the
13 2006 time frame is when Goodyear should have issued a
14 product service bulletin on the effects of tire aging
15 like these manufacturers did?
16 A Well, I think they should have made that
17 information public in -- and by 2006 other tire
18 manufacturers had made the decision to make that
19 information public, so it would have been appropriate
20 for Goodyear to make it available at that time as
21 well.
22 Q And you're aware that Goodyear has issued
23 product service bulletins on aging and in fact did so
24 as far back as March of 2006 --
25 A Yes.

13 (Pages 49 to 52)

Lisa F. Laux, PhD - 4/15/2019

**Page 73**

1  appreciate having that on their tire? Would you
2  agree with that?
3     A   I would agree that some owners might not
4  want red or white or yellow print on the sides of
5  their tires.
6     Q   And with regard to your prototype, you go
7  on to state that, "The prototype warning should be
8  validly tested with a representative user group to
9  determine whether it can be seen and read and whether
10 it is understood."
11         You have not done that testing validation,
12 have you?
13    A   Well, I can't stamp tires, so, no, I
14 haven't.
15    Q   All right. And are you aware of anyone
16 who has undertaken that testing?
17    A   I don't think any tire manufacturer has
18 attempted to stamp this into their tire, no.
19    Q   Are you aware of anyone, even independent
20 of a tire manufacturer, who has attempted to undergo
21 this testing -- or undertake this testing?
22    A   There is no way anyone can undergo this
23 testing unless they have the capacity to stamp a
24 tire.
25    Q   Okay. So the answer is --

**Page 74**

1     A   Has to be no, right?
2     Q   -- there is no such testing.
3     A   Of course not.
4     Q   All right. And then you state, "Once a
5  warning is in place, data should be collected on
6  accidents to determine whether the warning is being
7  effective."
8     A   That's standard.
9     Q   And this is obviously stating the obvious,
10 but there clearly is no data that you're aware of
11 that goes to the effectiveness of such a prototype
12 warning, correct?
13    A   Well, since this prototype warning hasn't
14 been stamped into any tires that I'm aware of,
15 clearly there's not.
16    Q   All right.
17    A   But that's standard practice for any
18 manufacturer, is to collect data like this to
19 determine if something is effective or not, a warning
20 is effective or not.
21    Q   And clearly, given that this relates to
22 stamping on the tire at the time of manufacture, I
23 assume it's your opinion that this prototype warning
24 should have been on this tire at the time it was
25 manufactured in June of 1994?

**Page 75**

1     A   I certainly wish it were, but do I expect
2  that it would have been? No.
3     Q   Okay. And why is it that you expect it
4  would not have been?
5     A   Well, I think in June of 1994 there was
6  not a general consensus among all of the tire
7  manufacturers about this issue.
8     Q   And so had it not been included back in
9  June of 1994, you wouldn't have been critical of
10 Goodyear or any tire manufacturer for not putting it
11 on there because there was no recognized consensus in
12 the industry at that time.
13    A   Well, would I be critical? Would I think
14 that they probably already knew about this based on
15 the early -- wait a minute. Let me give my answer.
16    Q   I was.
17    A   No, you weren't. You were getting ready
18 to interrupt me.
19        So, you know, this issue was already known
20 in the community as recognized by VW putting it on
21 their car, but do I -- would I be critical? I would
22 be critical of anybody who knew something about a
23 hazard and didn't tell people. Do I -- do I
24 understand why this wasn't yet placed on the tire?
25 Yes.

**Page 76**

1     Q   Yeah, so in terms of -- and I want to
2  understand whether -- is it your opinion to a
3  reasonable degree of professional certainty that in
4  this case this tire was unsafe as manufactured in
5  June of 1994 by virtue of the fact that it did not
6  have this prototype warning on it?
7     A   Well, actually I do believe that it was
8  unsafe not to have a -- it doesn't have to be this as
9  the prototype -- not to have this information about
10 the age that they -- the tire was manufactured so
11 that people could determine how old it was, but I
12 understand that at that time tire manufacturers were
13 not warning about this issue and they were still
14 resistant to the idea, I believe, that tires aged
15 out.
16        So am I surprised that it wasn't on there?
17 No. Do I wish it had been on there? Yes. Am I
18 critical? Well, I don't know whether I would say I'm
19 critical or not. I understand why it's not on there.
20    Q   And without going through each of them
21 individually, isn't it true that the product service
22 bulletins we identified, the NHTSA study you've
23 referenced, the Baldwin study that you've referenced,
24 and probably others, all of those relate to activity
25 that was ongoing in the mid 2000's?

Lisa F. Laux, PhD - 4/15/2019

**Page 77**

1  A    Yes, a lot of it was -- started in the
2  early 2000's, yes.
3     Q    And is there anything other than the
4  Volkswagen reference that you mentioned on your
5  Appendix B that predates all of that, that goes back
6  into the 1990's and deals with this issue of aging?
7     A    I bet you I didn't put it in that list,
8  but I do have a bunch of old operator's manuals, and
9  just like the old Jetta manual, many of them talk
10 about replace -- they're all European cars.  All
11 European cars only.  I never saw an it in an American
12 car, but I did see it in other European cars that --
13    Q    Which European cars?
14    A    I'm not sure, but I can certainly get you
15 those.
16    Q    Well, as you sit here today, can you
17 identify any owner's manual from --
18    A    BMW I think was one of them.
19    Q    BMW what year?
20    A    Well, in the early 1900's -- 1990's, but I
21 can't tell you exactly for sure which year, but, you
22 know, I did cite that one because I liked the
23 forthright way in which they talked about tires and
24 spare tires.
25    Q    Where did you cite the BMW?

**Page 78**

1  A    I didn't.
2     Q    Oh.
3     A    I cited this one, which is what I said
4  that I thought -- this is from a Jeep in 2013 that
5  was in the owner's manual, and I thought that was an
6  excellent warning.
7     Q    So other than the European owner's manuals
8  that you're unable to specifically identify, are you
9  aware of any study or reference or work being done
10 here in the United States in the 1990's that deals
11 with this issue?  Can you cite me to any?
12    A    Well, I think what NHTSA started the study
13 in 2002.
14    Q    All right.  So that would be the earliest
15 that you're aware of?
16    A    That's the earliest one that I know of in
17 the United States, yes.
18    Q    And turning then to number 8, you refer to
19 a couple of things there that in your judgment would
20 be foreseeable to Goodyear regarding a tire 20 years
21 old.  And I don't need to get too deep into the weeds
22 on this.  I just want to know, is there anything here
23 specifically from Goodyear, from a Goodyear witness,
24 from a Goodyear document, that leads you to conclude
25 this was foreseeable to Goodyear, or is this

**Page 79**

1  statement based again solely on the other references
2  that you've told me about in this deposition?
3            Does that make sense to you what I'm
4  asking?
5     A    It does, but there's a lot of things that
6  I said it was foreseeable to Goodyear about.  So, you
7  know, they talk about reasons to replace a tire, and
8  aging is not one of them, but it was foreseeable to
9  Goodyear that a tire could be 20 years old and not
10 have any of those -- that's what this statement is
11 all about -- not have any of those characteristics
12 that they say are reason to replace a tire.
13           So they could foresee that a tire could
14 get to be 20 years old and not have any of those
15 cracks, bulges, tread worn down to a minimum depth or
16 damage caused by underinflation or overloading, but
17 that it would be 20 years old and that based on the
18 NHTSA information and the other information, Baldwin
19 and so forth, that being 20 years old alone meant
20 that it was more likely to lose tread.
21    Q    Now, do those references say that just
22 being 20 years old makes it more likely to lose
23 tread?
24    A    If you look at the -- was more likely to
25 fail, I guess I should say, and typically that

**Page 80**

1  failure is detreading.
2            But if you look at the graph in the NHTSA
3  reports, if you look at John Baldwin's data, sure, it
4  does say that they are more likely to fail the older
5  they get after six years old.
6     Q    Okay.  But it doesn't say that they're
7  more likely to lose tread.
8     A    I don't recall whether they said that or
9  whether they just said fail.
10    Q    And is the NHTSA data on the Ford
11 Firestone tires?
12    A    No.  That was one of the impetus for doing
13 it, but they did research on -- the 2002 study was on
14 tire failure, period.
15    Q    All right.
16    A    Tire failure, period.
17           See, when they did this research report to
18 Congress in 2007 on tire aging, that was not just on
19 the Firestone tires.
20    Q    Okay.  Are you aware of -- and I apologize
21 if I've asked you this, but -- and sometimes I tend
22 to jump around and I forget whether I've asked you
23 things before or not.
24           Are you aware of any manufacturer that
25 puts the born date on their tire?

20 (Pages 77 to 80)

Lisa F. Laux, PhD - 4/15/2019

Page 81

1  A   No, I'm not.
2  Q   Are you aware of any manufacturer that
3  puts any type of a warning regarding the aging on
4  their tire?
5  A   No. They have some warnings on their
6  tires but not about aging.
7  Q   All right. And do we agree that NHTSA has
8  never recommended that such a warning about aging be
9  put on the tires, have they?
10 A   I don't think they have, no.
11 Q   And do we agree that NHTSA has never
12 recommended that a born date be put on tires, have
13 they?
14 A   They haven't, although they have
15 recognized the difficulty that people have
16 determining the manufacture date of tires based on
17 the DOT number, but they haven't made any effort to
18 change that.
19 Q   And do we agree that there is no federal
20 regulation that requires placement of an age-related
21 warning on the tires?
22 A   There's not.
23 Q   I want to ask you about number 9 if I may.
24 A   Okay.
25 Q   You say, "Goodyear's failure to adequately

Page 82

1  warn and instruct vehicle owners and maintainers and
2  drivers about the hazards associated with driving at
3  highway speeds on a tire more than 10 years old
4  created an unreasonably dangerous situation, which
5  precipitated the injury/death accident."
6      I take that to mean that you're talking
7  about the accident that happened here to Mr. Loveland
8  and Mr. Summers?
9  A   Yes. It wasn't a death, though, actually.
10 Q   Yes. And when you say "Goodyear's failure
11 to adequately warn and instruct vehicle owners," how
12 would in your judgment Goodyear have adequately
13 warned and instructed vehicle owners? Would that
14 have been through the labeling on the tire that we've
15 talked about?
16 A   Well, that would have been one way, but of
17 course I'm not talking about that here.
18 Q   Okay. What are you talking about here?
19 A   Well, I'm talking about the fact that if
20 they had notified all the tire places like Kearney's
21 and everybody who -- you know, who has -- who
22 maintains their tires, and certainly it could have
23 been put in the driving -- wherever people go to get
24 their driver's licenses renewed, all those kinds of
25 locations, to make this information widely known,

Page 83

1  then when he went into Kearney's to have those tires
2  put on his vehicle, they would have known about it,
3  and they would have said to him, look, these tires
4  are 20 years old, we don't want to mount these tires.
5  Like Discount Tire won't put a tire 10 years old or
6  even service a tire 10 years old anymore because they
7  recognize the hazard. They're probably one of the
8  biggest maintainers in the U.S.
9      So if this had gotten out to places like
10 Kearney's and other places, smaller places --
11 Discount's a very big place. They do -- have had
12 problems and so they recognize the issue, but
13 someplace like Kearney needs to get the information,
14 and this could be put out by Goodyear.
15 Q   Well, other than the product service
16 bulletins, are you saying that there is some other
17 means by which that should have been communicated, or
18 is it just through the product service bulletins?
19 A   Well, it's my understanding that most tire
20 manufacturers just send the tire service bulletins to
21 places where their tires are bought in large
22 quantities.
23 Q   And that's sufficient, correct, in your
24 judgment?
25 A   Well, it would be better if they were sent

Page 84

1  out to places like Kearney's and other smaller groups
2  of people who also deal with tires, mount and service
3  tires, and there are plenty of them. And I recognize
4  that, you know, locating all of them is not
5  necessarily simple, but they are all registered with
6  the state typically and so they can be located. So
7  if you want to make this information public, if you
8  want to make people aware of it, you could certainly
9  have public service announcements on the radio and on
10 TV.
11 Q   Well, I know you could do a lot of things.
12 What --
13 A   Sure you could, and it's an issue that you
14 should do because it's clearly one that the driving
15 public is not aware of.
16 Q   Well, but, you know, Dr. Laux, I'm trying
17 to differentiate between things that you think would
18 be a good idea versus your opinions in this case.
19 Okay? And so I --
20 A   My opinion is --
21 Q   So I need --
22     MR. FARRAR: Let him finish the question.
23 Q   (By Mr. Bott) I need to understand how is
24 it that you think Goodyear failed to provide adequate
25 information -- or failed -- I'm sorry, failed to

21 (Pages 81 to 84)