**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| RYSTA LEONA SUSMAN, both individually and as Legal Guardian of Shane Allen Loveland, and JACOB SUMMERS,<br><br>Plaintiffs,<br><br>v.<br><br>THE GOODYEAR TIRE & RUBBER COMPANY,<br><br>Defendant. | Case No. 8:18CV127<br><br>**BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' FAILURE TO WARN EXPERT, LILA F. LAUX** |

The Goodyear Tire & Rubber Company ("Goodyear"), by and through undersigned counsel, hereby submits its Brief in Support of Defendant's Motion to Exclude Plaintiff's Failure to Warn Expert, Lila F. Laux.

**INTRODUCTION**

Plaintiffs' claims include a strict products liability failure to warn claim asserted in Count II: "Further, the subject tire was defective and unreasonably dangerous because it lacked adequate warnings to consumers and users about the dangers associated with tire aging irrespective of wear and use, including detreads." (Notice of Removal, Ex. 1 – Exhibits, Ex. D– Complaint (hereinafter, "Compl.") ¶ 25, ECF No. 1-1 at 24.) Plaintiffs proffered one expert on this claim, Lila F. Laux, Ph.D. ("Laux"). In her report of March 13, 2019 (attached hereto as **Exhibit A**), Laux advances three warnings-related opinions: (a) that Goodyear "should have provided a Product Service Bulletin to all tire repair shops and to all tire sales facilities recommending that all tires more than 10 years old be replaced or never driven at highway speeds"; (b) that "Goodyear should have provided the 'born date' on the tire on both sides of the sidewall"; and (c) that "[a]n

1

adequate warning regarding tire aging would include the elements" in the prototype warning set out in her report. (Exhibit A, p. 6, ¶ 5 through p. 7, ¶ 7.)

In her deposition, Laux admits she is not critical of Goodyear's warnings when the tire (the "Tire at Issue") was manufactured in 1994; that doing as she opines was not consistent with industry practice; that she did not test or submit for peer review her proposed "warnings" or labeling changes; and that she generated the opinions solely for the purposes of legislation. This Court should exclude Laux's opinions for a variety of reasons, including: they fail to assist the jury on the legal issues presented, are withdrawn by Laux herself, are nothing more than Laux's unsupported subjective beliefs, or fail to satisfy the *Daubert* guideposts.

## ARGUMENT

### I. The *Daubert*/Rule 702 Analysis.

Federal Rule of Evidence 702 governs the admissibility of testimony by experts regarding "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. The seminal United States Supreme Court case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, control this inquiry. As the Rule expressly provides, expert testimony must be grounded in reliable principles and reliable methods. Both elements are required for an expert to provide admissible testimony.

Three prerequisites are required to admit expert testimony under Rule 702. First, "evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). Second, "the proposed witness must be qualified to assist the finder of fact." *Id.* Third, "the proposed evidence must be reliable or trustworthy in an evidentiary sense,

so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.* (quoting *Daubert*, 509 U.S. at 591).

In *Daubert*, the Supreme Court charged federal trial judges to act as "gatekeepers" in screening expert opinions. The Court set forth a multi-factored approach designed to determine whether proffered expert testimony is relevant and reliable. The Court enumerated the following non-exclusive "guideposts" to assist a trial court in performing its gatekeeper function: (1) whether the theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether the theory has been generally accepted. *Daubert*, 509 U.S. at 593-94. Further, "*Daubert*'s progeny provides additional factors such as: whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Lauzon*, 270 F.3d at 687; *see also* Fed. R. Evid. 702 Advisory Committee's Notes to 2000 Amendments (identifying, with case citations, other factors that courts may consider).

Additionally, the testimony must be relevant. Plaintiffs must show that the reasoning is "applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006). A court should not admit opinion evidence that "is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Put another way, when the analytical gap between the data and proffered opinion is too great, the opinion must be excluded. *Id*.

A district court's gatekeeping function informs the Rule 702 analysis. That analysis is intended to evaluate whether the methodology used in reaching an opinion is sound. As noted by

3

the Supreme Court in *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), "[s]ince *Daubert*, moreover, parties relying on expert evidence have had notice of the exacting standards of reliability such evidence must meet."

## II. Laux Concedes That She Is Not Critical Of Goodyear In Two Important Respects.

Laux has effectively conceded two of the three opinions noted above and, as such, this Court should strike them if not voluntarily withdrawn by Plaintiffs. Those opinions are: 1) that Goodyear should have issued "product service bulletins"; and 2) that "[a]n adequate warning regarding tire aging would include the elements" in a prototype included in her report.

### A. Laux conceded her "product service bulletin" opinion.

Laux opines in her report that Goodyear "should have provided a Product Service Bulletin to all tire repair shops and to all tire sales facilities recommending that all tires more than 10 years old be replaced or never driven at highway speeds." (Exhibit A at p. 6, ¶ 5.) However, when asked at her deposition about her product service bulletin opinion, Laux testified as follows:

> **Q:** With regard to your opinion 5,[1] do you hold an opinion that in fact Goodyear should have issued a public service bulletin as you describe in opinion 5 in the year 1990?
>
> [ ]
>
> **A:** And do I think they could have? Yes. *Do I think they should have? I don't think so, no.*
>
> [ ]
>
> **Q:** So would you agree then that *you're not critical* of Goodyear for not issuing such a product service bulletin in the year 1994?
>
> **A.** *No, I'm not.*

---

[1] It is referred to as "opinion 5" because that is the paragraph number by which it appears in Laux's report, attached as Exhibit B.

4

(Laux Deposition, April 15, 2019, attached as **Exhibit B**, 49: 9-12, 16-17 and 25; 50: 1-3.) Instead, she testified that Goodyear should have begun issuing product service bulletins on tire aging around 2006. (*Id*. at 52: 9-21.)

This concession is important because Nebraska law evaluates the adequacy of warnings as a "defect" based on "*when [the product] was placed on the market and left the defendant's possession.*" *Haag v. Bongers*, 589 N.W.2d 318, 328 (Neb. 1999) ("A product may be defective and unreasonably dangerous because the product was sold without sufficient warnings or instructions."). Because of this, Nebraska also does not recognize a post-sale duty to warn. *See Anderson v. Nissan Motor Co., Ltd.*, 139 F.3d 599, 602 (8th Cir. 1998) ("[ ] Nebraska favors limiting the state's products liability law to actions or omissions which occur at the time of the manufacture or sale. Based on this conclusion, we hold that the district court correctly dismissed [plaintiff's] claims for post-sale duty to warn [ ]."); *Vallejo v. Amgen, Inc.*, 2014 WL 4922901 *4 (D. Neb. Sept. 29, 2014).

Because Laux is not critical of Goodyear for not issuing product service bulletins in 1994 when the Tire at Issue was manufactured, and instead opines that it would have been "appropriate" for Goodyear to issue them in 2006, her opinion is not material to any actionable claim. Admitting this opinion would not aid, and would only confuse, the jury.

### B. Laux conceded her "prototype warning" opinion.

Similarly, during her deposition Laux refused to actually offer an opinion critical of Goodyear with regard to her "prototype warning" opinion. That opinion, as stated in her report, is that "[a]n adequate warning regarding tire aging would include the elements" in a prototype she drafted.[2] (Exhibit A at p. 7, ¶ 7.) It is noteworthy that Laux's report states only that the "prototype" is what an "adequate warning" would look like, *not that she holds the opinion that*

---

[2] The content of the prototype warning is not pertinent to this motion given Laux's admissions cited here.

5

*Goodyear should have included the prototype warning when it manufactured the Tire at Issue in 1994.* (*Id.*)

Given the chance to clarify her report during her deposition, Laux actually confirmed she has no opinion critical of Goodyear for not including her "prototype warning" on the Tire at Issue in 1994. When asked, Laux testified as follows:

> **Q:** And clearly, given that this relates to stamping on the tire at the time of manufacture, I assume its your opinion that this prototype warning should have been on this tire at the time it was manufactured in 1994?
>
> **A:** *I certainly wish it were, but do I expect that it would have been? No.*
>
> **Q:** Okay. And why is it that you expect it would not have been?
>
> **A:** Well, I think in June of 1994 there was not a general consensus among all of the tire manufacturers about this issue.
>
> [ ]
>
> **Q:** Yeah, so in terms of – and I want to understand whether – is it your opinion to a reasonable degree of professional certainty that in this case this tire was unsafe as manufactured in June of 1994 by virtue of the fact that it did not have this prototype warning on it?
>
> [ ]
>
> **A.** So am I surprised that it wasn't on there? No. *Do I wish it had been on there? Yes. Am I critical? Well, I don't know whether I would say I'm critical or not. I understand why its not on there.*

(Exhibit B, at 74: 21 through 75: 1-7; 76: 1-6, 16-19.)

Again, based on the authority cited above, because Laux holds no opinion critical of Goodyear for not including something akin to the "prototype warning" on the Tire at Issue in 1994, her testimony does not aid the jury in deciding any actionable fact or issue on a submissible claim. Nebraska product liability law, including with regard to warnings, considers the product at the time it is manufactured. Nebraska does not recognize a post-sale duty to warn,

6

and Laux's testimony has no relevance to any issue in the case. Permitting Laux to testify to opinions with no bearing on submissible claims does not aid, and could only confuse, the jury. Furthermore, Laux repeatedly acknowledges that her warning preference arises only to her personal "wish" as to what Goodyear might have done. Under the FRE 702/*Daubert* analysis it is well settled that the "subjective beliefs" of an expert are insufficient, unreliable and inadmissible. *Daubert*, 509 U.S. at 590.

### III. Laux's "Born Date" Opinion Is Not Admissible.

Laux's third and final warnings-related opinion is that Goodyear should have included a "born date" on both sides of the Tire at Issue when manufactured in 1994. (Exhibit A at p. 6, ¶ 6.) As a threshold matter, the Court should be aware that *the manufacture date of the Tire at Issue (and all automobile tires everywhere in the United States) does in fact already appear on the sidewall.* This is referred to in the industry as the "DOT number" or "DOT Code" on a tire, and is used by Goodyear and all other tire manufacturers as mandated by regulations of the Department of Transportation. Specifically, the last four digits provide the year and month in which a tire was manufactured. This is not in dispute. (*Id*. at p. 5, ¶ 16.) Laux's opinion, which is based exclusively on limited material from 2003 and 2005 and therefore utterly impertinent under Nebraska law to Goodyear's tire labeling in 1994, is that the date should merely be stated and located *differently*.

At her deposition, Laux made the following concessions regarding this opinion, underscoring the multiple ways in which it fails to satisfy the strictures of FRE 702/*Daubert*:

- She is aware of no tire manufacturer, in 1994 or at any time, that places her proposed "born date" on a tire. (Exhibit B, at 80: 24 through 81: 1.)

- She admits that the National Highway Traffic Safety Administration (NHTSA)

7

has never recommended that a "born date" be put on tires. (*Id*. at 81: 11-14.)

- Laux admits that as recently as 2015, NHTSA evaluated whether to revise the tire manufacture date as it appears in the DOT number and determined to not make any recommendations for changes. (*Id*. at 111: 2-8.)

- She has identified no industry standard, generally accepted practice, or state of the art suggesting placement of a "born on" date on a tire beyond the manufacturing date already included in the DOT number. (Exhibit A.)

- Laux opines that Goodyear should have placed a "born date" on both sidewalls based on NHTSA materials *from 2003* that sometimes the DOT number sidewall is mounted facing inwards. (*Id*. at 5, ¶ 14 and note 19.)

- Laux, in addition to relying on material generated 9 years post-sale, does not link the location of the DOT number to the facts of this case as she does not know and does not state whether the Tire at Issue was mounted with the sidewall facing inward. In fact, it's the opposite. The Tire at Issue was mounted with the serial side outboard, facing outward, and so the DOT number and manufacture date was visible to any user. (Deposition of David Roy Southwell, Plaintiffs' purported tire expert; 106: 13-23, attached as **Exhibit C**.) As such, her opinion on location is mere *ipse dixit* and not tethered to the facts of this case. *Marmo*, 457 F.3d at 758; *Gen. Elec. Co.*, 522 U.S. at 146.

- Laux admits that her opinion on a layperson's ability to "decode" the DOT number is based solely on one article from 2005, twelve years after the manufacture of the Tire at Issue. (Exhibit A at p. 5, ¶ 17 and note 21.)

- Laux does not link her "decoding" opinion to the facts of this case, as she does not state whether anyone involved in the use of the Tire at Issue here understood, or even read,

8

the Tire's sidewall and the DOT number affixed to it. (Exhibit A.)

- Laux admits that it is not "a challenge" to interpret the manufacturing date stamped into the DOT number. (Exhibit B, 63: 21 through 64; 2.)

- Laux agrees that providing the month and year of manufacture, which the DOT number on the Tire at Issue already does, is "probably adequate." (*Id*., 65: 11-16.)

- Laux agrees that she hasn't "analyzed exactly where on the tire" her proposed "born date" would even go ("No specific opinion yet, no."). (*Id*., 65: 15-23; 67: 2.)

- She in fact defers to the expertise of tire manufacturers generally for where a manufacturing date should be placed, given that she has not analyzed the issue: "That would be up to the tire manufacturer . . ." (*Id*. at 65:19 through 66:1.)

- She does not know what color her "born date" should be, but thinks it "would be dandy if it could be" only to then perform a prompt about-face, stating "I don't think it's reasonable to make it colored." (*Id*. at 66: 2-4.)

- She has not provided a prototype "born date" demonstrating, in addition to either location or color, her proposed size or font type. (*Id*. at 66: 6-16.) Again astonishingly, Laux defers to the expertise of the tire manufacturers: "There are a number of things *that the manufacturer would need to determine before putting this message on the side of the tire*." (*Id*. at 66: 6-16; 67: 21-22 ("And I haven't done that. That's up to the manufacturer to do."))

- Laux further goes into a great detail about the accepted methodology in the field of "human factors" (Laux identifies herself explicitly as a "human factors" expert – Exhibit A at 1) for prioritizing risks in the context of product warnings, to determine "the ones that we want to put on product warnings about" *but admits that she did not apply that methodology or perform that analysis in this case* and that "*the manufacturers of tires can do that*, I can't do that."

9

(Exhibit B, 103:17 through 105: 10.)

- Laux admits that her sole experience with regard to tires and warnings is limited to litigation testimony. (*Id.* at 110: 8-11.) She is the definition of a professional witness who does not apply any of her tire opinions in real world applications. She has never designed a consumer product, never performed any studies that directly relate to tires, never written any articles on tire service life or aging, *and has never written any warning on any product that was sold to the public*. (*Id.* at 110: 3-23.)

- Finally, Laux holds her "born date" opinion solely on the assumption that "tire aging" is potentially dangerous, but has conceded that both of her opinions on product service bulletins and warnings do not apply to tires manufactured in 1994 because "tire aging" did not reasonably become an issue until over a decade after the Tire at Issue was manufactured, and was not even studied by NHTSA until 2002. (*Id.* at 78:7-13) Her opinion is not tethered to the facts of this case and the "analytical gap" renders it inadmissible.

Simply put, Laux's "born date" opinion is the type of litigation-driven junk science repeatedly rejected by the Eighth Circuit and the Supreme Court.[3] Her "methodology" was based solely on looking at what tire manufacturers do to inform the public of the date on which a tire was manufactured – which they all in fact do – and coming up with a generalized way to say they should do that same thing, but differently. Indeed, Laux describes in detail a specific methodology used in her purported field of "human factors analysis" regarding warnings, but admits she did not apply it. Not only that, but because Laux admits that she has "not analyzed"

---

[3] Laux has offered similar conclusory opinions and insufficient methodologies previously, and been stricken on multiple occasions. Recently in *Pechac v. Goodyear Tire and Rubber Company*, Superior Court of Arizona, Maricopa County, October 20, 2018. Attached as Exhibits C and D are the moving papers and resulting court order. *See also*, *In re Fema Trailer Formaldehyde Prods. Liability Litig.*, 2009 WL 2169224 (E.D. La. July, 15, 2009) ("She seems to play the role of an 'uber juror' rather than as an expert"). Interestingly, Laux does not include the *Pechac* case in her file list and claimed at her deposition here taken only 6 months after she was barred in *Pechac*, that she did not recall what the case was about even though she testified in it as a human factors tire aging expert and offered many of the same opinions offered here. (Exhibit B, 117: 3 through 119: 11.)

10

where the "born date" should be placed, what size it should be, or what color it should be, *she repeatedly leaves it to the tire manufacturer to figure out the requisite details of her own non-specific opinion.* In effect, Laux's "born date" opinion is that tire manufacturers should do something new, though she hasn't analyzed precisely what, which she then leaves to the analysis and expertise of the very manufacturers she purports to criticize. It is supported by no industry standard, no conduct within the industry, no materials or studies extant at the date the Tire at Issue was manufactured, and no testing performed by Laux or anyone else on which she relies. *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1084 (8th Cir. 1999) (excluding warnings expert who did not specifically design more appropriate content, did not test alternative content, and who could identify no other manufacturer who used the hypothetical warning). Laux's superficial tail-wags-the-dog opinion is blatantly speculative, unsupported by reliable methodology, and offers no particularized expertise whatsoever to aid a fact-finder under the demanding FRE/*Daubert* analytical framework. It should be stricken.

## CONCLUSION

For each of the foregoing reasons, this Court should strike Laux's failure to warn opinions.

GREENSFELDER, HEMKER & GALE, P.C.

By:   /s/ Edward S. Bott, Jr.
Edward S. Bott, Jr.
Clark W. Hedger
Juliane M. Rodriguez
10 South Broadway, Suite 2000
St. Louis, MO 63102
(314) 241-9090
Fax: (314) 345-5465
esb@greensfelder.com
ch1@greensfelder.com
jrodriguez@greensfelder.com

AND

BAIRD HOLM LLP
Jennifer D. Tricker (NE# 23022)
1700 Farnam Street, Suite 1500
Omaha, NE 68102-2068
(402) 344-0500
jtricker@bairdholm.com

*Attorneys for The Goodyear Tire & Rubber Company*

12

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was served via the Court's electronic filing system, this 12th day of August, 2019 to:

Kyle W. Farrar
KASTER, LYNCH, FARRAR & BALL, LLP
1010 Lamar, Suite 1600
Houston, TX 77002
kyle@fbtrial.com

Paul E. Godlewski
SCHWEBEL, GOETZ & SIEBEN, P.A.
80 South 8th Center
5120 IDS Center
Minneapolis, MN 54402
pgodlewski@schwebel.com

Michael F. Coyle
FRASER, STRYKER LAW FIRM
409 South 17th Street
Suite 500, Energy Plaza
Omaha, NE 68102
mcoyle@fraserstryker.com

*Attorney for Plaintiffs*

/s/ Edward S. Bott, Jr.

1810387