*EXHIBIT B*

Larry Blair - 2/7/2019

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

RYSTA LEONA SUSMAN, both ) Case No. 8:18-cv-00127
individually and as Legal )
Guardian of SHANE ALLEN )
LOVELAND, et al., )
 )
    Plaintiffs, )
 )
  vs. )
 )
THE GOODYEAR TIRE & RUBBER )
COMPANY, )
 )
    Defendant. )

Videotaped deposition of LARRY BLAIR taken on behalf of the Defendant at the Omaha Correctional Center, 2323 Avenue J, Omaha, Nebraska, on February 7, 2019, commencing at 10:02 a.m.

## Page 2

APPEARANCES

For the Plaintiffs:  MR. KYLE W. FARRAR
                     KASTER, LYNCH, FARRAR &
                      BALL, LLP
                     1010 Lamar Street
                     Suite 1600
                     Houston, TX 77002
                     713-221-8300
                     kyle@fbtrial.com

For the Defendant:   MR. EDWARD S. BOTT, JR.
                     GREENSFELDER, HEMKER &
                      GALE, P.C.
                     10 South Broadway
                     Suite 2000
                     St. Louis, MO 63102
                     314-241-9090
                     esb@greensfelder.com

Videographer:        Mr. Roger Speakman

## Page 3

I N D E X

APPEARANCES . . . . . . . . . . . . 2
STIPULATIONS . . . . . . . . . . . 4
REPORTER'S CERTIFICATE . . . . . . . 119

WITNESS:
  Larry Blair
    Direct Examination by Mr. Bott . . . . . . . . 6
    Cross-Examination by Mr. Farrar . . . . . . . . 102
    Redirect Examination by Mr. Bott . . . . . . . 107

EXHIBITS:                           Marked
        (NONE)

## Page 4

S T I P U L A T I O N S

It is stipulated and agreed by and between the parties hereto:

1. That the deposition of LARRY BLAIR may be taken before Marcy Benge, RMR, General Notary Public, at the time and place set forth on the title page hereof.

2. That the deposition is taken pursuant to notice.

3. That the original deposition will be delivered to Mr. Edward S. Bott, Attorney for Defendant.

4. That the deposition is taken pursuant to the Federal Rules of Civil Procedure.

5. That the testimony of the witness may be transcribed outside the presence of the witness.

6. That the signature of the witness to the transcribed copy of the deposition is waived.

1 (Pages 1 to 4)

Larry Blair - 2/7/2019

### Page 37

1  Nebraska --
2    A.  Yeah.
3    Q.  -- driver's license, after this
4  accident at some point?
5    A.  Yeah.
6    Q.  Okay.  When did you get that back?
7    A.  2017 is when I got it back.
8    Q.  I'm sorry.  When?
9    A.  2017.  I don't remember the month.
10   Q.  Your CDL license, though, you've
11 never tried to get that back?
12   A.  No.
13   Q.  All right.  You got your State of
14 Nebraska license back because you went, you took
15 the test, and you passed the test?
16   A.  Yeah.
17   Q.  You said earlier they took it away
18 from you because you were having some issues with
19 your -- your memory and your brain?
20   A.  Yeah, my brain.
21   Q.  Okay.  And I just want to make sure,
22 you've -- you said a moment ago that you remember
23 the accident --
24   A.  Yeah.
25   Q.  -- right?  So we've got no issues

### Page 38

1  with you understanding my questions or -- or --
2    A.  No.
3    Q.  And you're going to be able to tell
4  me about the accident, because you remember things
5  now --
6    A.  Yeah.
7    Q.  -- correct?  All right.  Let me ask
8  you a little bit about your employment at Dandee.
9  Do you recall when you -- well, you told me.  You
10 started there in March of 2013?
11   A.  Yes.
12   Q.  You worked there up until the
13 accident in May of 2015?
14   A.  No.  2015 I was on workmen's comp.  I
15 went back -- I went back to work in 2016.
16   Q.  Right.
17   A.  I was off workmen's comp.  I went
18 back there and worked.
19   Q.  I understand.
20   A.  And then I got fired.
21   Q.  From March of 2013 up until May 1,
22 2015 --
23   A.  Yeah.
24   Q.  -- were you a full-time employee --
25   A.  Yes.

### Page 39

1    Q.  -- or a seasonal employee?
2    A.  Full-time.
3    Q.  And then your job was a laborer?
4    A.  Yes.
5    Q.  And what would you do as a laborer?
6    A.  Carry forms.  Set up -- set up forms
7  for the pour.  Carry up, clean -- clean up.  Stack
8  the stuff into -- help put stuff away.
9    Q.  You knew Shane Loveland?
10   A.  Yes.  Shane Loveland was my best
11 friend.
12   Q.  How long had you and Shane been
13 working together?
14   A.  We'd been working together for off
15 and on since I started there, since Shane started
16 there.
17   Q.  Do you remember when he started?  It
18 was after you, I know, but --
19   A.  After -- had to be when he was living
20 in Fairview.
21   Q.  Did you guys know each other before
22 he started working at Dandee?
23   A.  No.
24   Q.  When you say you worked off and on
25 together, I take it you weren't always on the same

### Page 40

1  crew, then?
2    A.  Shane was on John's crew.
3    Q.  John who?
4    A.  I don't know his last name.  He was
5  the super- -- he was the supervisor for a crew
6  until he got fired.  But he was on John's crew,
7  and I was on Chris's crew.  And every time we'd
8  get a job, John -- John would come over and
9  Loveland was with him.  So me and Loveland used to
10 sit there and work all together and joke around
11 all together and stuff like that.
12       Then after a while and that, he
13 started coming over to my house and me and him was
14 joking around.  Him and his girlfriend would come
15 over when I was living in -- me and him and my
16 other -- my partner, Hopkins, were working
17 together and we all sat there and joked around.
18 Have a couple of beers, joked around.
19   Q.  Were you living at the time near
20 Dandee or --
21   A.  Yeah.  I was living on 17 -- 17th --
22 1722 17th Street.
23   Q.  Was that close to Dandee?
24   A.  Yes.
25   Q.  So then how about Jacob Summers?  Did

Epiq Court Reporting Solutions - Chicago
312.386.2000

Larry Blair - 2/7/2019

**Page 41**

1  you know him very well?
2      A.   Yeah.  When he started working at
3  Dandee.  And he was my ride partner.  Really not
4  my ride partner, but he ran -- he worked for my
5  crew, and we all worked together.
6      Q.   Did you have your crew?
7      A.   No.  I had -- I call -- it's -- it
8  was Chris Lee's crew.  It's just when he --
9  when -- I call it my crew because it's been a long
10 time.  But mostly it was Chris Lee's crew, and he
11 worked with us.  So everything we did, Jake did.
12     Q.   So on May 1, 2015, it was you, Shane
13 Loveland, and Jake Summers --
14     A.   Yeah.
15     Q.   -- together?  Had you guys been
16 working on that crew together for a period of
17 time?
18     A.   Me and -- me and Shane -- Shane --
19 Jake was.  Shane was -- after John got fired,
20 Chris took Shane in on -- on our crew, and we was
21 working together.  And it was me driving.  It was
22 Chris in the middle.  And Shane in the passenger
23 seat.
24     Q.   Is that how it was typically or --
25     A.   Yes.

**Page 42**

1      Q.   Okay.  And that's how it was on the
2  day of the accident?
3      A.   Yes.  Because Shane was -- been in
4  the crew longer, so he got seniority.  He rode --
5  he rode -- he rode over by the driver's side --
6  the passenger's door, and the newbie always rode
7  in the middle.  I should know.  I had to do that a
8  couple times.
9      Q.   Yeah.  The -- we've seen a safety
10 manual from Dandee Construction.  Are you familiar
11 with what I'm talking about?
12     A.   Oh, yeah.
13     Q.   Did you have a copy of that when you
14 started --
15     A.   Oh, yeah.
16     Q.   -- your work there?  Okay.
17     A.   Oh, you're bringing up a place I
18 really don't like anymore.
19     Q.   Did they kind of hammer home on you
20 about safety?  Or --
21     A.   They didn't hammer home on safety.
22 We hammered them for safety.
23     Q.   Okay.  Tell me about that.
24     A.   That company wasn't safety.  We -- I
25 reported that for three years.  That truck wasn't

**Page 43**

1  safety.  Me and Shane reported it.  That truck
2  wasn't safety.  Them tires -- everything on that
3  truck wasn't safety.  He just threw that truck
4  together.
5      Q.   By "that truck," you're talking about
6  the 2003 Chevrolet Suburban that was involved in
7  the accident?
8      A.   Yeah.
9      Q.   Okay.  And when you say "he," you're
10 talking about --
11     A.   Dan Buser.
12     Q.   -- Dan Buser?
13     A.   Yeah.
14     Q.   What do you mean --
15     A.   He bought the cheapest tires.  He
16 bought cheap everything on that car, on that
17 truck.  Me and Shane fixed that truck so it
18 would -- would drive just right.
19     Q.   Tell me about that.
20     A.   The truck -- okay.  If we had a
21 little problem with the truck, me and Shane worked
22 on it and got the tires, got everything fixed on
23 it and everything else.  We had other tires on it
24 before he bought new tires on it.  Because he
25 buyed new tires for each truck and everything

**Page 44**

1  else.  We --
2      Q.   Now, can I stop you?  Because do you
3  know if they were new new tires or were they new
4  used tires?
5      A.   No.  Dan bought new tires -- new
6  tires.
7      Q.   Okay.
8      A.   He don't went -- he never went that
9  cheap.  But what it was is, me and Shane -- Shane
10 fixed -- worked on the car, changed the oil.
11 Because in the wintertime, we changed the oil.  So
12 sometimes we change it after a certain miles.  We
13 have to change the oil and everything else, brake
14 fluid and everything.  We had it all running just
15 fine.
16          We went home, come back, most of the
17 trucks had new tires.  I don't know -- I think
18 it's down the street.  He takes them to this
19 place, and they gave him new tires.
20     Q.   Have you heard about Kearney Towing &
21 Service?  Is that the place you're talking about?
22     A.   Yeah.  I think that's -- I heard of
23 that place.
24     Q.   There's another one.
25     A.   I know there's another one, too.  But

Larry Blair - 2/7/2019

### Page 65

1  that day?
2  A. Yeah.
3  Q. Okay. So I assume that you had a
4  meeting this morning on May 1, and you were told
5  that --
6  A. We're going to Hastings.
7  Q. All right. What were you going to do
8  in Hastings?
9  A. We was going to do a stamp job.
10  Stamp the sidewalk.
11  Q. Stamp sidewalk?
12  A. Yes.
13  Q. Okay. And where is Hastings from
14  Kearney?
15  A. Forty-eight miles away. About 48,
16  45 -- 45, 48 miles away. Depends where you want
17  to go, what part of Hastings.
18  Q. Is that east or what?
19  A. Yeah. I think it's -- you go down.
20  You drive down -- drive through Kearney. You go a
21  little bit right, you go down, you can go over
22  there, you can take a -- take a right to Axtell or
23  take a left and you go to -- you go to Minden, and
24  Hastings is the next town over.
25  Q. I guess I was wondering, because

### Page 66

1  somebody said that you guys were on one job first
2  thing in the morning and then you were on your way
3  to a second job to help out another crew. Am I
4  wrong on that? How -- how did that -- you don't
5  remember it that way?
6  A. I don't remember it that way.
7  Q. So let me -- yeah. Because the
8  accident happened around 7:00 in the morning?
9  A. Yeah.
10  Q. Did -- was anyone else going to go
11  work this Hastings job with you, or was it just
12  you three?
13  A. No, no, no, no, no. That was -- that
14  was me -- it was my crew, the truck I was in: me,
15  Shane, Jake. Then you have Chris. Chris was
16  driving the truck up there. If one -- one crew
17  goes, one of us go, we all go.
18  Q. All right.
19  A. Because we're the stamp crew and
20  everything else and everything, we was doing a
21  stamp job, and then Chris was the main stamper.
22  Chris, Solo, and Don were the three main stamp
23  people. Me, Shane, and Jake were the people that
24  gave them the -- gave them the stamps, gave them
25  the stamper, gave them the -- gave them everything

### Page 67

1  they need. We was the labor that gave them -- get
2  the tools done.
3  And when we're doing a stamp job,
4  everybody in there have to have certain parts,
5  certain things of the crew to do. Because if one
6  person messes up, the stamp work is screwed up,
7  and that's $20,000 that's messed up. So we have a
8  certain situation to do, and that's what we did.
9  All five follow Chris along. When
10  Chris drives, I follow him. I don't go -- I
11  didn't go by myself. I went and followed Chris.
12  It was Chris -- it was Chris, our crew. It was --
13  who else was there? No. He was over there.
14  Yeah. We was going to help another person. I
15  just -- Mike. We was going to go help Mike.
16  Q. So were you the lead car, or were you
17  following somebody or --
18  A. I was following Chris.
19  Q. All right. You were driving?
20  A. Yes.
21  Q. You would have Jacob Summers in the
22  middle?
23  A. Yep.
24  Q. Shane on the passenger side?
25  A. Yep.

### Page 68

1  Q. Were you wearing your seatbelt?
2  A. No.
3  Q. Do you know whether Shane Loveland
4  was wearing --
5  A. No.
6  Q. -- his seatbelt? Do you know, or you
7  don't know?
8  A. Yeah, I know. He wasn't wearing it.
9  Q. He wasn't wearing it?
10  A. No.
11  Q. And was Jacob wearing his seatbelt?
12  A. No.
13  Q. All right. Back to the truck, we've
14  talked a little bit about this, but I just want to
15  make sure. Are you aware of any significant
16  maintenance done to that truck? And by that I
17  mean work on the struts or on the suspension or on
18  the -- the -- the brakes or the steering system.
19  Are you aware of anything like that?
20  A. (Witness shook head.)
21  Q. Is that no?
22  A. No.
23  Q. All right.
24  A. When anything done with that truck --
25  if anything goes with that truck, they tell us.

Epiq Court Reporting Solutions - Chicago
312.386.2000

```
 1                    C E R T I F I C A T E
 2        I, Marcy Benge, RMR, General Notary Public, duly
 3   commissioned, qualified, and acting under a general
 4   notarial commission within and for the State of
 5   Nebraska, do hereby certify that:
 6                         LARRY BLAIR
 7   was by me first duly sworn to tell the truth, the whole
 8   truth, and nothing but the truth; that the foregoing
 9   deposition was taken by me at the time and place herein
10   specified and in accordance with the within
11   stipulations; that I am not counsel, attorney, or
12   relative of either party or otherwise interested in the
13   event of this suit.
14        IN TESTIMONY WHEREOF, I have hereunto set my hand
15   officially and attached my notarial seal at Lincoln,
16   Nebraska, this 18th day of February, 2019.
17
18
19                                   
20
21
22                                   
23
24
25
```