*EXHIBIT C*

Daniel T. Bueser - 10/23/2018

### Page 1

```
                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEBRASKA

RYSTA LEONA SUSMAN,         )   CASE NO. 8:18-cv-00127
   both individually and as )
   Legal Guardian of SHANE  )
   ALLEN LOVELAND, et al.,  )
                            )
              Plaintiffs,   )
                            )
         v.                 )
                            )
THE GOODYEAR TIRE & RUBBER  )
COMPANY,                    )
                            )
              Defendant.    )

                      Taken at:
                     Holiday Inn
                   110 S. 2nd Avenue
                      Kearney, NE
                Tuesday, October 23, 2018
                 Commencing at 2:19 p.m.
        TRANSCRIPT OF THE DEPOSITION OF DANIEL T. BUESER
              TAKEN ON BEHALF OF THE DEFENDANT

                      APPEARANCES:
For The Plaintiffs:   Kyle W. Farrar
                      KASTER, LYNCH, FARRAR & BALL, LLP
                      1010 Lamar, Suite 1600
                      Houston, TX 77002
                      (713) 221-8300
                      And
                      Paul E. Godlewski
                      SCHWEBEL, GOETZ & SIEBEN, P.A.
                      80 South 8th Center
                      5120 IDS Center
                      Minneapolis, MN 54402
                      (612) 344-0327
For The Defendant:    Edward S. Bott, Jr.
                      GREENSFELDER HEMKER & GALE PC
                      10 South Broadway, Suite 2000
                      St. Louis, MO 63102
                      (314) 241-9090
```

### Page 2

```
Court Reporter/    Sarah A. Becker
Transcriber:       CENTRAL NEBRASKA REPORTING INC.
                   P.O. Box 308
                   Gothenburg, NE 69138-0308
                   (308) 325-7537
```

### Page 3

```
                        INDEX
                                                   PAGE

Appearances ------------------------------------- 1,2

Index --------------------------------------------- 3

Stipulation --------------------------------------- 4

Reporter's Certificate ---------------------------- 5

                Direct   Cross   Redirect  Recross
WITNESS:
Daniel T. Bueser  6       61       71        --

EXHIBITS:              Marked    Offered    Found
1 Subpoena to produce    5         --      Appendix
  Documents
   (20 pages)
2 Fixed Asset Item       5         --      Appendix
  For 2004 Chevy Pickup
   (1 page)
3 Letter to Dandee Const. 5        --      Appendix
  From Greensfelder Attorneys
   (2 pages)
4 Dandee Construction    5         --      Appendix
  Employee Manual and
  Safety Policy
   (53 pages)
5 Subpoena               5         --      Appendix
   (6 pages)
6 Amended Notice of      5         --      Appendix
  Deposition
   (6 pages)
```

### Page 4

STIPULATIONS

    IT IS STIPULATED AND AGREED by and between the parties thereto by their respective counsel of record that this sworn oral deposition of DANIEL T. BUESER may be taken before Sarah A. Becker, electronic reporter and General Notary Public in and for the State of Nebraska, at the time and place set forth on the title page hereof.

    IT IS STIPULATED that all objections, except as to form and foundation of the questions are reserved until the time of the trial.

    IT IS STIPULATED that the testimony may be transcribed out of the presence of the witness.

Daniel T. Bueser - 10/23/2018

13

1  Q  -- would handle most of your work?
2  A  Would be Tony.
3  Q  Do you know Tony's last name?
4  A  No.
5     (Colloquy between parties off the record.)
6  Q  (By Mr. Bott) So, we have -- to -- to get back
7  to what we were talking about, Tony would be the person
8  at Garrett Tires that you would -- you, your company,
9  would primarily deal with if vehicles were sent to
10 Garrett Tires for service?
11 A  Right.
12 Q  All right.  What types of things would go to
13 Garrett Tires?  What kind of service work?
14 A  Well, any -- any flat tires or new tires would
15 be Garrett or -- or Kearney Towing.  Kearney Towing also
16 did a lot of our tire repairs and stuff.  Now, in the
17 last, what, two years or three years ago, we -- we bought
18 Kearney Towing's tire changer and so we do a lot of our
19 own tire repairs ourselves now.  We did not until just a
20 couple of years ago.
21 Q  So --
22 A  All tire- -- All tires were -- Any flats or
23 repairs or new tires were all outsourced to either
24 Garrett or Kearney Towing.
25 Q  Okay.  As of May 1, 2015, had Dandee done any

14

1  tire --
2  A  No.
3  Q  -- repair of its own?
4  A  No.
5  Q  Okay.  So, prior to May 1, 2015, any tire work
6  would've been outsourced --
7  A  Right.
8  Q  -- to either Kearney or to Garrett Tire?
9  A  Right.
10 Q  All right.  How many -- Well, what type of
11 equipment do you own in a company?  And -- And, as an
12 example, what I'm talking about is we're -- we're here
13 dealing with this pickup truck.
14 A  Uh-huh.
15 Q  And I under- -- I assume you had other pickup
16 trucks.  I don't know if you had other equipment --
17 construction-related equipment or not.  Can you just give
18 me an idea of what it was that you owned and used at your
19 work?
20 A  Exactly how much we had then, I'm not sure, but
21 right now I think we have 22 tru- -- pickups or light
22 trucks.  We have one big Western Star truck with a crane
23 on it for form delivery.
24 Q  You said Western Star truck?
25 A  It's a Western Star.  And we have six skid

15

1  steer loaders and two mini excavators.  We did have a
2  backhoe.  We had one dump truck.
3  Q  Okay.  Anything else you remember?
4  A  Well, then we had -- we had a Ford boom truck
5  with a winch or a crane -- a small crane on it to set
6  power trowels and stuff.
7  Q  That was -- And when you say --
8  A  I don't have that --
9  Q  -- then that was in May of --
10 A  I don't have that one anymore.  I did -- At
11 that time, I had that blue Ford.  It -- It was an old
12 telephone-pole-setting truck where it had a boom, you
13 could hold a telephone pole, and it had an auger to dig
14 the hole, and we used it to set power trowels in and out
15 of basements.
16 Q  And -- And that -- that was a piece of
17 equipment you had back in May of 2015?
18 A  Right.  I -- I don't have that one anymore.
19 Q  Okay.  Let me stop for a minute and I'll --
20 I'll -- one thing I should've said to you at the
21 beginning that I forgot is that if you and I talk over
22 one another, I mean we -- we do it all the time in our
23 every day life, right, but in this context it's kind of
24 hard for a court reporter to get it down accurately if
25 we're talking at the same time.  So, I'm going to try --

16

1  A  Okay.
2  Q  I'm going to try to make sure I let you finish;
3  if you could try to let me finish my question, it might
4  flow a little better.  Okay?
5  A  Okay.
6  Q  Thanks.  All right.  So, the -- the equipment
7  that you just detailed for me, with the exception of the
8  Ford boom truck, was it otherwise pretty much the same as
9  of May 1, 2015 as it is now?
10 A  Yeah.
11 Q  Okay.
12 A  I mean, we've updated some trucks, you know,
13 got some more trucks and sold some of the old ones, but
14 basically the same.
15 Q  All right.  And with regard to the service work
16 on these trucks, again, other than the oil changes or
17 replacing the fuel pump or something simple, Dandee would
18 not do the service work, but you would send it out?
19 A  It would go to Kearney Towing.
20 Q  Okay.  And again, the tire work on all of these
21 vehicles would again go to either Kearney or to Garrett?
22 A  That -- Pretty much those two would be all of
23 it.  Once in a while we might've used Graham, but very --
24 Pretty much Kearney Towing because our old shop was right
25 across the street from Kearney Towing and so we'd just

Epiq Court Reporting Solutions - Chicago
312.386.2000

Daniel T. Bueser - 10/23/2018

17

1 walk across the road.  And so Kearney Towing pretty much
2 had 100 percent of our business.
3      Q   Okay.
4      A   And when we moved down south to the new office
5 it stayed –- pretty much stayed that way.
6      Q   Do you have any mechanics that you employ?
7      A   No.
8      Q   Do you have any mechanical training?
9      A   No.
10     Q   Okay.  So, let me try to –- to lay some –- some
11 background of kind of what brings us here today.  Mr.
12 Bueser, I've got this Exhibit 1.  This is the subpoena
13 that was sent to you back in September of 2018.  Do you
14 –- Do you remember that?
15     A   Vaguely, yeah.
16     Q   Okay.  And –- And then in –- I'll show you
17 that; I'm going to look at it also.
18     A   Okay.
19     Q   And if you go in one more page or so, or maybe
20 another page, you'll see that we –- Well, back one, I
21 think.  We –- We asked that you produce like 12 or 13
22 different categories of documents –-
23     A   Okay.
24     Q   -- from the company.  Do you recall that?
25     A   Not really, but –-

18

1      Q   Okay.  The –- The documents that we received in
2 response to that subpoena –- This is Exhibit 2, it's
3 called a "Fixed Asset Item", which relates to the 2003
4 Chevrolet half-ton pickup that was involved in this
5 accident that we're talking about.
6      A   Okay.
7      Q   Can you just tell us what that document is?
8      A   It just has the description "2003 Chevy half-
9 ton pickup".  We bought it from Mollee's Motor Works.
10 Exactly –- Oh, it's got the purchase date here; 4/21 of
11 2006.
12     Q   Okay.  All right.  And –- And then, also, what
13 you gave to us in –- in response to that first subpoena
14 is this exhibit that I've marked as No. 4.
15     A   Okay.
16     Q   Which is the Dandee Construction Employee
17 Manual.
18     A   Okay.
19     Q   Do you –-
20     A   Okay.
21     Q   And –- And can you identify that as, in fact,
22 the –-
23     A   Yeah, this is our employee manual and safety
24 policy.
25     Q   Was that the manual that would've been in

19

1 effect as of May of 2015?
2      A   Yes.
3      Q   Okay.  Is that the manual that would've been –-
4 Well, first, let me ask you, do you –- do you give that
5 manual to all of your new employees when they –-
6      A   Yes.
7      Q   -- are hired?
8      A   We try and give these out to the new employees.
9      Q   Okay.  And do they have to sign for receipt of
10 them?
11     A   No.
12     Q   Okay.  Does each employee –- new employee get a
13 copy of that?
14     A   Yes.
15     Q   Okay.  And so would Mr. Susman and Mr. Summers
16 and Mr. Blair have received a copy of this –-
17     A   They should've.
18     Q   -- instruction –-
19     A   I –- I couldn't –- I couldn't guarantee you
20 that they got one, but they should've had one or –-
21     Q   Okay.
22     A   -- had access to it.
23     Q   All right.  And so then after we received
24 Exhibits 2 and 4 in response to our first subpoena, my
25 assistant sent to your company, to the attention of

20

1 Tammy, this letter that I've marked as Exhibit 3, asking
2 again if you had anything more other than these two
3 documents.  Do you –- Do you recall seeing Exhibit 3 at
4 all?
5      A   Yes.
6      Q   Okay.  And did you search at all for any more
7 documents after you got Exhibit 3?
8      A   I had my secretary look on the computer to see
9 if she found any receipts or anything and she did not
10 find anything on the computer.  I did not look in the
11 attic through the old receipts.  I –- I could do that,
12 but I don't know if I'll find anything or not.
13     Q   Okay.  So, then we've got Exhibit 5 is the
14 subpoena that was more recently served on you to be here
15 for this deposition today.
16     A   Okay.
17     Q   Okay.  So, I'll –- I'll show you that and –-
18     A   Okay.
19     Q   -- you've –- you've seen that, I assume?
20     A   Yes, that one I got here.
21     Q   Okay.  And again, attached to that is a list of
22 various things that we asked that you produce.  It's
23 essentially identical to the first subpoena.
24     A   Okay.
25     Q   But –- And then Exhibit 6 is my notice for the

Daniel T. Bueser - 10/23/2018

45

1 did the pre-shift inspection, found the tires were low on
2 inflation pressure and needed to add air to it, would
3 that employee do it or would they ask somebody like Mr.
4 Underwood to do it?
5   A   No, the employee would do it.
6   Q   Yeah. Do you –- As you sit here today, do you
7 know what inflation pressure these particular tires were
8 to be inflated to?
9   A   I do not. I think they were 65 but I wouldn't
10 guarantee that.
11  Q   Okay. And why do you think 65?
12  A   That's what they –- I don't know. I just –-
13 They got a lot of different tires and they all take
14 different pressure, but I was thinking those were 65.
15  Q   Okay. But whether that –- whether that
16 understanding comes from the placard or comes from the
17 tire itself, you –- you really don't know?
18  A   Don't know.
19  Q   Okay. So, we saw from one of these exhibits
20 that these –- the vehicle was purchased on April 21,
21 2006?
22  A   Right.
23  Q   And I think it indicates that it had –- Well,
24 it doesn't state it here but I think in, again, notes of
25 –- of another file document I think from Farm Bureau, I

46

1 think it was indicated that it had about 90,000 miles on
2 it when --
3   A   That's about right.
4   Q   -- when you bought it?
5   A   Yeah.
6   Q   Do you know who you bought it from?
7   A   From Mollee's.
8   Q   Oh, that's right. I'm sorry. And do you know
9 how many miles were on it at the time of the accident?
10  A   That I do not know.
11  Q   The warehouse at Dandee Construction, is it
12 fully enclosed?
13  A   Yes.
14  Q   So, during the summer time, are –- are the
15 pickup trucks, and specifically this pickup truck that
16 we're talking about, it is stored when not in use
17 inside –-
18  A   Right.
19  Q   -- that building?
20  A   Yes.
21  Q   All right. Even during the winter time and –-
22  A   Right.
23  Q   -- summer time? Okay.
24  A   Yep.
25  Q   And is it heated and cooled?

47

1   A   Yes, heated.
2   Q   Okay. And from the time that this pickup truck
3 was purchased in April 21, 2006, up until the time of
4 this accident on May 1, 2015, was it used solely in the
5 business of Dandee Construction Company?
6   A   Yes.
7   Q   Do you have any knowledge of where the vehicle
8 was stored after the accident?
9   A   No.
10  Q   Do you know who took custody of the vehicle
11 after the accident?
12  A   I think the insurance company.
13  Q   Do you know if the tires remained on the
14 vehicle after the accident?
15  A   That I don't know.
16  Q   Do you recall when Mr. Blair started working
17 for you?
18  A   Not exactly, but he worked for me, I believe,
19 for three years.
20  Q   His last day would've been May 1, 2015?
21  A   Would've been the day of the accident.
22  Q   Okay.
23  A   He –- He did –- He did come back to work after
24 the accident for several months.
25  Q   Okay. Do you know how long he was off work

48

1 because of the accident?
2   A   I could look at my diary and find out, but I
3 think it was four or five months.
4   Q   So, he was off for a period of time after the
5 accident and then he came back maybe –-
6   A   He came back and worked for a while.
7   Q   Okay. Do you know how long he worked for you
8 then after that?
9   A   I'm going to guess four or five months.
10  Q   Okay. And why did he stop working for you?
11  A   I let him go because his attendance was very
12 erratic, and I gave him warning that he had to be there
13 every day on time and he was not.
14  Q   Had his performance been erratic before May 1,
15 2015?
16  A   It was –- It wasn't too bad before, but after
17 the accident it was terrible.
18  Q   So, there were some instances of erratic
19 behavior before May 1, 2015, but then it worsened after
20 May 1?
21  A   Yeah, after the accident he seemed to have too
22 many problems that kept him from coming to work.
23  Q   All right. And –- And if you're not able to
24 tell me that, that's fine, please don't, but do you know
25 what problems he was having?

12 (Pages 45 to 48)

C E R T I F I C A T E

STATE OF NEBRASKA)
                 )
COUNTY OF DAWSON )

      I, Pamela S. Buddenberg, electronic reporter, do hereby certify the above and foregoing transcription was taken at the time and place as set forth on the title page hereof, before me, an electronic recorder, later transcribed, and is a true and correct extension hereof;

      That the witness was by me, Pamela S. Buddenberg, General Notary Public, first duly examined, cautioned and solemnly sworn to testify to the truth, the whole truth, and nothing but the truth;

      I further certify that I am not a relative, attorney, or counsel of any of the parties hereto, nor otherwise interested in the outcome of this litigation.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal at Gothenburg, Nebraska this 1st day of November, 2018.

*[Signature: Pamela S. Buddenberg]*

Pamela S. Buddenberg
Notary Public

GENERAL NOTARY - State of Nebraska
PAMELA S. BUDDENBERG
My Comm. Exp. April 18, 2019