IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RYSTA LEONA SUSMAN, both individually and as Legal Guardian of SHANE ALLEN LOVELAND, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>THE GOODYEAR TIRE & RUBBER COMPANY,<br><br>    Defendant. | Case No. 8:18-cv-00127 |

**GOODYEAR'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE EVIDENCE PURSUANT TO THE <u>SELF CRITICAL ANALYSIS PRIVILEGE</u>**

The Goodyear Tire & Rubber Company ("Goodyear"), by its attorneys, submits its Memorandum of Law in Support of Goodyear's Motion in Limine to Exclude Evidence Pursuant to the Self Critical Analysis Privilege.

**INTRODUCTION**

Goodyear manufactured the Tire at Issue in June 1994. In 1995, Goodyear opened an internal investigation into a unique failure mode involving Goodyear Load Range E Light Truck tires – complete detachments of the tread and top belt along 360° of the tire's circumference. This investigation continued formally through 1998 and continued informally for several years thereafter. No root cause was ever identified by Goodyear, but the investigation did reveal that the addition of a nylon overlay significantly reduced the incidence of "tread throws[1]." As a result, Goodyear changed the design of Load Range E Tires to include a nylon overlay.

---

[1] "Tread throw" was the name given to this unique failure mode by Goodyear's investigative teams. (Tr. 12.4.01 Deposition of Beale Robinson in *Garcia*, attached as Exhibit P, at 88-89 (transcript is from 2001 and does not have line numbers).)

1

Goodyear has stipulated and admits that incorporating a nylon overlay into the Subject Tire's design was feasible at the time the Tire at Issue was manufactured in 1994.

At trial, Goodyear anticipates that Plaintiffs will seek to offer documents, evidence and testimony regarding Goodyear's election to internally analyze and investigate the "tread throw" issue. For the reasons that follow, Goodyear requests that this Court issue an order precluding the use of any and all documents relating to Goodyear's investigation into the Load Range E "thread throw" issue.[2]

## RELEVANT FACTUAL BACKGROUND

I.  **The Subject Accident And The Tire at Issue.**

On May 1, 2015, Shane Loveland and Jacob Summers were passengers in a 2003 Chevrolet Silverado SC1 pickup truck when the right rear tire (the "Tire" or "Tire at Issue") mounted on the truck suffered a partial tread detachment. (Compl. ¶ 10, ECF No. 1-1 at 21.) The tire did not lose air.

The Tire at Issue is an LT235/85R16 Goodyear Wrangler HT tire bearing DOT # MD0RNJHV244, which identifies a tire manufactured by Goodyear at its Gadsden, Alabama plant during the 24th week of 1994. (Expert Report of David Southwell ("Southwell Rep."), ECF No. 109, Ex. B, at 5, § 3.a.) Thus, it was almost 21 years old on the date of the accident. The Tire is classified as a Load Range E tire, which reflects the fact that it was designed to bear loads within the Load Range E classification. Load Range E tires include Goodyear Wrangler HT tires, and numerous other sizes and models of Goodyear tires. All major tire manufacturers produce Load Range E tires. (*See* NHTSA ODI Resume, attached as Exhibit I, at 2.)

---

[2] Specifically at issue are bates pages: GY_Susman_000001-01374; GY_Susman_01375-06325; GY_Susman_20845-25871.

According to Plaintiffs' purported tire failure expert, David Southwell, the Tire at Issue experienced a partial tread separation immediately before the accident. (Southwell Rep., ECF No. 109, Ex. B, at 5-6.) The tread and the Tire's second belt became detached between the 180-degree mark and the 350-degree mark on the Tire, as measured on the opposite-serial side shoulder of the Tire. (*Id.*) Detachment is different than a "tread throw." Plaintiffs' expert maintains that this tread detachment caused the accident. (*Id. passim.*)

## II. Goodyear's Investigation Into Tread Throws Involving Load Range E Tires And Goodyear's Subsequent Tire Design Modifications.

In 1995, Goodyear undertook an investigation of "tread throws" in Load Range E tires (hereinafter the "Tread Throw Investigation"). (Tr. 11.5.19 Deposition of Jay Lawrence ("Lawrence Depo."), attached as Exhibit C, at 55:11-15; 2.12.02 Tr. Deposition of Beale Robinson in *Boerm* ("Robinson Dep."), attached as Exhibit E, at 27:12-28:14.) This self-imposed investigation sprang from Goodyear's discovery, in the 1994-1995 timeframe, of four tires returned to Akron, Ohio for adjustment—i.e., tires that had been taken out of service, replaced under warranty, and then sent to Akron for analysis—which exhibited a unique failure mode demonstrated by a "complete tread and top belt separation, without any other sign of injury or damage or misuse to the tire." (Lawrence Dep., Ex. C, at 65:9-66:10; Robinson Dep., Ex. E, at 27:12-28:14; 7.17.02 Tr. 7.17.02 Deposition of Richard J. Olsen in *Aufiero* and *Arredondo* ("Olsen Dep."), attached as Exhibit D, at 95:8-96:14; 104:20-105:14.) This failure mode was referred to as tread throws, which is to say complete separations of the tread and top belt along 360° of the tires' circumference between belts 1 and 2. This unique, never seen before, failure mode gave rise to Goodyear's investigation into the tread throw issue in Load Range E tires. (Lawrence Dep., Ex. C, at 65:9-66:10; Olsen Dep., Ex. D, at 111:17-115:3.)

3

Goodyear's investigation into the root cause for the tread throws continued formally through 1998, and informally through 1998, and informally for several years thereafter. As part of its investigation into the "tread throw" problem, Goodyear experimented with several changes to the manufacture and design of Load Range E Tires. In early 1996, Goodyear modified the design of LT235/85R16 Wrangler HT tires to include nylon overlays in the tires' construction. (Lawrence Dep., Ex. C, at 45:20-46:8.) Goodyear then monitored the field performance of these tires with the overlay to assess if it eliminated the tread throws. While not completely eliminating tread throws, it did significantly reduce the number of such incidents. As a result, Goodyear decided in 1998 to install nylon overlays on all Load Range E tires. No root cause for the tread throws was ever found and no other design change tested by Goodyear was effective in reducing the incidence of tread throws.

The present case does not involve a "thread throw" allegation in that the separation was not a complete detachment of the tread and top belt from the bottom belt and carcass of the tire, and because inspection by both plaintiffs' expert and Goodyear's expert found that this separation initiated in a localized area and progressed through use to a partial detachment on the date of the accident. The experts differ on the cause of the separation (defect v. impact) but not on the location where it began. (Tr. 3.28.19 Deposition of David Southwell ("Southwell Dep."), attached as Exhibit B, at 26; 5.9.19 Expert Report of Joe Grant, attached as Exhibit N, at 7-8, 12-20.)

Southwell's defect theory is that this tire had "extensive" areas of thermal oxidative degradation.[3] (Southwell Dep., Ex. B, at 13:8-13). This thermal oxidative degradation was "age-related" and affected the body ply and skim coat. (Southwell Dep., Ex. B, at 21:24-22:3.) This thermal oxidative degradation combined with belt placement increased stress to the tire

---

[3] Thermal oxidative degradation refers to degradation of the polymers due to heat, oxygen, light and weathering.

causing a separation at the 340º area of the tire which progressed over time. (Southwell Dep., Ex. B, at 23:22-24:25, 105:22-25; Southwell Rep.,ECF No. 109, Ex. B, at 6.) Southwell further opines that there was good adhesion of the components at manufacture, but due to the thermal oxidative degradation the rubber between belts 1 and 2 lost its strength. (Southwell Dep., Ex. B, at 96:2-97:14.) The tread and top belt stopped tearing at the 150º location on the tire because there was either a separation at that point or from the bending back and forth as it hit the wheel well. (Southwell Dep., Ex. B, at 108:1-109:13.)

This failure mode is distinguished from the failure mode that lead to the Load Range E investigation on several fronts. 1) it was a partial and not complete detachment of the tread and top belt; 2) it initiated at an identifiable localized area; 3) it did not involve the entire interface between belts 1 and 2 as good adhesion at the approximately 150º location caused the separation to stop and tear free; and 4) according to Southwell, extensive age-related thermal-oxidative degradation was a substantial contributor to the cause of the separation.

## ARGUMENT

### I. Ohio Privilege Law Applies.

Questions of privilege are determined by state law in a federal diversity case. *Cervantes v. Time. Inc.*, 464 F.2d 986, 990 (8th Cir. 1972); *see also Simon v. G.D. Searle & Co.*, 816 F. 2d 397, 402 (8th Cir. 1987); Fed. R. Evid. 501. To determine the applicable state law in a federal diversity case, a court must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mnfg. Co., Inc.*, 313 U.S. 487, 496 (1942). The Supreme Court has recognized an exception to this rule for transfers pursuant to 28 U.S.C. § 1404(a) "requiring that the state law applicable in the original court also apply in the transferee court." *Atl. Marine*

1836816v5

*Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 65 (2013) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)). The original court here is located in Pennsylvania.

Pennsylvania applies the most significant relationship test to determine which state's law will apply to the given question. "The merit of such a rule is that it gives to the place having the most interest in the problem paramount control over the legal issues arising out of a particular context and thereby allows the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the particular litigation." *Griffith v. United Air Lines, Inc.*, 416 203 A.2d 796, 806 (Pa. 1964) (internal citation and quotation marks omitted). This choice-of-law framework applies in discovery disputes implicating claims of privilege. *See Carbis Walker, LLP v. Hill, Barth and King, LLC*, 930 A.2d 573, 578 (Pa. Super. Ct. 2007).

In conducting the interest analysis, the court must decide which state has the most significant relationship or contacts with the issue before the court. *Budtel Assocs., LP v. Continental Cas. Co.*, 915 A.2d 640, 643 (Pa. Super. Ct. 2006). This analysis does not involve simply counting the number of contacts each state has with the matter at hand. *Cipolla v. Shaposka*, 566, 267 A.2d 854, 856 (Pa. 1970). Rather, "[t]he weight of a particular state's contacts must be measured on a qualitative rather than quantitative scale." *Id*. "[T]his means we must determine which state...has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law." *In re Agostini's Estate*, 457 A.2d 861, 871 (Pa. Super. Ct. 1983).

Application of the test here on issues regarding privilege dictates that Ohio privilege law applies. Goodyear is an Ohio corporation, with its headquarters in Ohio, and the Tread Throw Investigation was undertaken in Ohio. Simply put, no other state's privilege law can possibly apply in a "most significant relationship" test and the question is not close. The Court

1836816v5

determined that Ohio law should apply to punitive damages claims due to that state's interest in the internal conduct of its own corporations. Nor should a corporation reasonably anticipate that another state's privilege law would apply to its internal communications and documents of the type subject to this motion.

## II. Overview of the Self-Critical Analysis Privilege Under Ohio Law and the Applicable Elements.

Ohio courts have neither explicitly adopted nor rejected the self-critical analysis privilege. Indeed, there is limited decisional Ohio law on the subject. Ohio courts have recognized the privilege but have not yet found that it applied to a particular case. The case containing the most extensive discussion of the self-critical analysis privilege in Ohio is *Celebrezze, v. CECOS Int'l., Inc.*, 583 N.E.2d 1118 (Ohio Ct. App. 1990).

As a threshold matter, the court determined that it – or any Ohio court – has the authority to recognize the self-critical analysis privilege under Ohio law by virtue of Evid. R. 501, which provides in full:

> The privilege of a witness, person, state or political subdivision thereof shall be governed by statute enacted by the General Assembly ***or by principles of common law as interpreted by the courts of this state in the light of reason and experience***.

*Celebrezze*, 583 N.E.2d 1118 at n.2 (emphasis added). Having dispensed with the authority of Ohio courts to recognize and apply the privilege, we turn to the test employed and the policy considerations on which the privilege is based.

The self-critical analysis privilege was first recognized nearly 50 years ago. *See Bredice v. Doctors Hosp., Inc.*, 50 F.R.D. 249, 251 (D.D.C.1970); *Banks v. Lockheed-Georgia Co.*, 53 F.R.D. 283 (N.D. Ga. 1971). It is rooted in sound public policy, premised "upon the concern that disclosure of documents reflecting candid self-examination will deter or suppress socially useful

7

investigations and evaluations or compliance with the law or with professional standards."

*Hardy v. New York News. Inc.*, 114 F.R.D. 633, 640 (S.D.N.Y. 1987). Put another way:

> The privilege protects an organization or individual from the Hobson's choice of aggressively investigating accidents or possible regulatory violations, ascertaining the causes and results, and correcting any violations or dangerous conditions, but thereby creating a self-incriminating record that may be evidence of liability, or deliberately avoiding making a record on the subject (and possibly leaving the public exposed to danger) in order to lessen the risk of civil liability.

*Reichhold Chems., Inc. v. Textron, Inc.*, 157 F.R.D. 522, 524 (N.D. Florida 1994). The self-critical analysis has been recognized and applied in a wide variety of areas, including those comparable to the scenario presented here. *See id.* (collecting cases); *Bradley v. Melroe Co.*, 141 F.R.D. 1 (D.D.C.1992) ("The reasoning behind this approach is that the ultimate benefit to others from this critical analysis of the product or event far outweighs any benefits from disclosure. Valuable criticism could not be obtained under the threat of potential or possible public exposure for it is not realistic to expect candid expressions of opinion or suggested changes in policies, procedures or processes knowing that such statements or suggestions may very well be used against colleagues and employees in subsequent litigation.").

In Ohio, the *Celebrezze* court acknowledged and applied the generally recognized three-part test for the privilege of self-critical analysis:

> [F]irst, the information must result from a critical self-analysis undertaken by the party seeking protection; second, the public must have a strong interest in preserving the free flow of the type of information sought; finally, the information must be of the type whose flow would be curtailed if discovery were allowed.

*Celebrezze*, 583 N.E.2d at 1120.

Application of the three elements by the court in *Celebrezze* is instructive here. As backdrop, *Celebrezze* involved an action by the State of Ohio against corporations operating in

8

the hazardous waste disposal business, which is germane to distinctive aspects of the court's holding relative to the present case.

Regardless, as to the first element the court held that it was clearly satisfied because there was no question that the defendant had undertaken a self-critical analysis. *Id.* at 1120. That question here is similarly not in dispute. Indeed, the report of Plaintiffs' purported tire failure expert, David Southwell, discusses Goodyear's undertaking of the Tread Throw Investigation and there is no dispute that the undertaking was voluntary and an internal decision. (Southwell Rep., ECF No. 109, Ex. B, at 23-24.)

The second element is that "the public must have a strong interest in preserving the free flow of the type of information sought." The third element is that the "information must be of the type whose flow would be curtailed if discovery were allowed." These elements take into consideration the public's interest in companies, such as Goodyear, undertaking such self-analysis for the greater good and the extent to which knowledge of consequent public disclosure would have an undesirable chilling effect on a party's decision to candidly evaluate its own practices. In *Celebrezze*, the court ultimately determined that the privilege did not apply but did so based on the peculiarly dangerous subject matter of the internal investigation and the intense interest of the State (the plaintiff in that case) in accessing the information for regulatory purposes – "we believe the strong public interest in hazardous waste regulation would adequately distinguish the facts in the action currently before us" from a case in which the self-critical analysis may more appropriately be applied. *Celebrezze*, 583 N.E.2d at 1121 n.3.

Here the issue does not involve widespread interest in hazardous waste disposal or the government's regulation of it. Rather, the public interest is very different. It is without question in the public interest that manufacturers in the automotive industry act as conscientious corporate

9

citizens and undertake critical self-analysis so as to more thoroughly determine the characteristics of their products for the public good. Indeed, it is undisputed here that as a result of the Tread Throw Investigation, Goodyear did undertake a design change which significantly reduced the "tread throw" issue (which, again, is not the same type of tread separation at issue in this lawsuit). Consistent with the public policy undergirding the self-critical analysis privilege, companies like Goodyear who manufacture products for public consumption should be encouraged to perform such voluntary undertakings and not fear retroactive penalization for doing so.

Similar to the rationale employed with regard to subsequent remedial measures, it would be against the public interest for parties to fear that their own self-evaluative processes, voluntarily undertaken to analyze the quality of their products, will be used against them at a later date. *Reichhold*, 157 F.R.D. at 524 ("The self-critical analysis privilege is analogous to, and based on the same public policy considerations as Rule 407, Federal Rules of Evidence, which excludes evidence of subsequent remedial measures."). Such a result would have a chilling effect on the decision-making process. Accordingly, the second and third elements are satisfied in this case and the Court should apply the self-critical analysis to the documents and information generated as part of the Tread Throw Investigation.

## CONCLUSION

Because evidence regarding the Tread Through Investigation should be deemed privileged under the self-critical analysis as it would be applied under Ohio law, Goodyear requests that this Court enter an order precluding Plaintiffs from introducing any evidence of, and from making any comment, reference, argument or innuendo regarding Goodyear's investigation into the Load Range E "thread throw" issue.

GREENSFELDER, HEMKER & GALE, P.C.


By:   /s/ Edward S. Bott, Jr.
Edward S. Bott, Jr.
Clark W. Hedger
Juliane M. Rodriguez
10 South Broadway, Suite 2000
St. Louis, MO  63102
(314) 241-9090
Fax:  (314) 345-5465
esb@greensfelder.com
ch1@greensfelder.com
jrodriguez@greensfelder.com

AND

BAIRD HOLM LLP
Jennifer D. Tricker (NE# 23022)
1700 Farnam Street, Suite 1500
Omaha, NE  68102-2068
(402) 344-0500
jtricker@bairdholm.com

*Attorneys for The Goodyear Tire & Rubber Company*

11

1836816v5

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with NECivR 7.1(d)(3) and further certify that the word count function was applied to include all text, including the caption, headings, footnotes, and quotations. This document was prepared using Microsoft Word 2010 and contains 3,229 words.

/s/ Edward S. Bott, Jr.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was filed with the Clerk of the Court and served upon all attorneys of record using the CM/ECF system this 4th day of February, 2020.

Kyle W. Farrar
KASTER, LYNCH, FARRAR & BALL, LLP
1010 Lamar, Suite 1600
Houston, TX 77002
kyle@fbtrial.com

Paul E. Godlewski
SCHWEBEL, GOETZ & SIEBEN, P.A.
80 South 8th Center
5120 IDS Center
Minneapolis, MN 54402
pgodlewski@schwebel.com

Michael F. Coyle
FRASER, STRYKER LAW FIRM
409 South 17th Street
Suite 500, Energy Plaza
Omaha, NE 68102
mcoyle@fraserstryker.com

*Attorneys for Plaintiffs*

/s/ Edward S. Bott, Jr.

1836816v5