# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RYSTA LEONA SUSMAN, both individually and as Legal Guardian of SHANE ALLEN LOVELAND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE GOODYEAR TIRE & RUBBER COMPANY, <br><br> Defendant. | ) ) ) ) ) ) ) Case No. 8:18-cv-00127 ) ) ) ) ) ) |

### GOODYEAR'S MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE SEEKING EXCLUSION OF THE DAY IN THE LIFE VIDEO OF SHANE LOVELAND

The Goodyear Tire & Rubber Company ("Goodyear"), by its attorneys, submits its Memorandum in Support of its Motion in Limine Seeking Exclusion of the Day in the Life Video of Shane Loveland:

### INTRODUCTION

At trial, Plaintiffs plan to introduce the "Day in the Life video of Shane Loveland." (ECF No. 157, No. 13.) Despite its name, the video is not limited to recorded depictions of Mr. Loveland performing activities of daily living. Rather, the video, which is professionally narrated, contains sympathy-provoking testimony from Mr. Loveland's mother and sister about Mr. Loveland's pre-accident enjoyment of life and post-accident suffering. In the video, Mr. Loveland's mother and sister testify about, among other things, the activities Mr. Loveland enjoyed before the accident, the nature and extent of the pain he suffers today, the help he needs with activities of daily living, their sadness about Mr. Loveland's condition, and how that condition has negatively affected the Loveland family.

1

The video also includes testimony from speech therapists, occupational therapists, and physical therapists that have treated Mr. Loveland since the accident. These professionals recount examples of the care they have provided, the progress Mr. Loveland has made, the problems he continues to suffer from, and the likelihood that Mr. Loveland's condition and disabilities will not improve meaningfully in the future. The video includes footage that appears designed specifically to create sympathy for Mr. Loveland and his family, including scenes of Mr. Loveland being unable to consistently beat a tambourine in time with his music therapist's singing, inability to identify the State he is in at the time of his interaction with his therapist, and his inability to determine whether a rock, cotton, or hamburger is the "hardest" substance, among other things.

After depicting Mr. Loveland receiving therapy from and/or playing games with young family members, the video ends with Mr. Loveland's sister testifying that "one tire" changed Mr. Loveland's life, took his independence away, and affected his family's lives forever.

The Court should preclude Plaintiffs from offering this video into evidence at trial because it contains inadmissible hearsay from witnesses who are available to testify at trial. Moreover, this made-for-litigation video appears specifically designed to create sympathy for Mr. Loveland and his family at the trial, or otherwise inflame the jury, rather than on depicting Mr. Loveland in his day-to-day life. As such, its introduction will unfairly prejudice Goodyear and confuse and mislead the jury.

## RELEVANT FACTUAL BACKGROUND

I. The Subject Accident.

On May 1, 2015, Shane Loveland and Jacob Summers were passengers in a 2003 Chevrolet Silverado SC1 pickup truck owned by their employer, Dandee Concrete Construction, when the

1837438v2

right rear tire (the "Tire" or "Tire at Issue") mounted on the truck suffered a disablement. (Compl. ¶ 10, ECF No. 1-1 at 21). Mr. Loveland and Mr. Summers were injured in the ensuing accident.

## II. The Day In The Life Video.[1]

Plaintiffs intend to show Mr. Loveland's Day in the Life video (the "Video") to the jury at trial. (ECF No. 157, No. 13.)[2]

The Video begins with a picture of the Tire at Issue at the scene of the accident—still on the truck, which had come to rest in the grass beside the highway—in which Mr. Loveland was injured. A narrator provides a brief explanation of the events leading up to the accident, describing the accident vehicle as "out of control" and "tumbling through the center median." The Video then overlays footage of the accident scene and Mr. Loveland receiving treatment at the scene with recordings of 911 calls by bystanders describing the aftermath of the accident, the severity of the Plaintiffs' injuries, and the need for a helicopter to airlift Plaintiffs to the hospital.

The Video then cuts to pictures of Mr. Loveland in the hospital, where he appears to be unconscious, and is intubated, wearing a neck brace, and connected to a number of wires, hoses, and tubes. The Video recounts the injuries Mr. Loveland suffered—a traumatic brain injury, three broken ribs, and a punctured lung, among others. It describes how Mr. Loveland was put into a medically-induced coma for five weeks while he recovered from his injuries. The narrator then describes how a stint was placed in Mr. Loveland's brain to relieve pressure, while a picture of Mr. Loveland with a bandage on his head (presumably covering the stint) plays on the screen.

Next, the Video shows pictures and videos of Mr. Loveland before the accident. Over these pictures and video, Mr. Loveland's mother describes how Mr. Loveland enjoyed a good life

---

[1] Goodyear has contemporaneously submitted to chambers a flash drive containing what Goodyear understands to be the version of the Day in the Life video Plaintiffs plan to show to the jury. The Video is identified on Goodyear's Index as Exhibit O.

1837438v2

before the accident. Ms. Susman, his mother, describes Mr. Loveland's love of fishing, his work ethic, and the joy he took from spending time with his family.

After showing Mr. Loveland's life before the accident, the narrator moves on to discuss Mr. Loveland's life now: how he lives with his mother and several other family members; how the family's dining room has been converted into a bedroom for Mr. Loveland; how the family has put a list of bathroom-related tasks in the bathroom for Mr. Loveland to help him remember the tasks he must complete in the bathroom; and how Mr. Loveland sometimes forgets to follow these tasks and has accidents. At this point in the Video, Mr. Loveland is shown using a walker to move throughout the house and the viewer sees that the seat of Mr. Loveland's pants is wet, suggesting that Mr. Loveland has soiled himself. Mr. Loveland's sister then testifies about the pain Mr. Loveland experiences in his hips, knees, and lower back when he tries to sit down on the couch, or the toilet, and while transitioning from a standing position to these positions.

After this segment, the Video transitions into clips of Mr. Loveland receiving several different kinds of therapy. This segment begins with Mr. Loveland receiving music therapy: specifically, listening to his therapist sing a song while he attempts to hit a tambourine with a drumstick or mallet. Next, the Video shows Nicole Chandonnet, a speech therapist who treated Mr. Loveland, describing some questions she planned to ask Mr. Loveland, and then asking Mr. Loveland these questions. The Video shows Ms. Chandonnet asking Mr. Loveland what State he is in, and shows Mr. Loveland answering the question incorrectly.

The Video also includes an interview with one of Mr. Loveland's physical therapists, who narrates some of the problems Mr. Loveland experiences walking. The Video shows Mr. Loveland receiving physical therapy from this therapist, and engaging in tasks like standing up, sitting down, engaging the brakes on his walker, and playing catch with a therapy ball with his mother. The

therapist then discusses the fact that Mr. Loveland is unlikely to make further advances with his physical therapy in the future. This scene ends with footage of Mr. Loveland and his mother touching fingers in a loving manner.

The Video continues with an interview with another of Mr. Loveland's physical therapists, who discusses his progress from being wheelchair-bound after his surgeries to being able to walk with a walker, and the maximum amount of distance Mr. Loveland can now walk, among other things. This therapist then describes Mr. Loveland's apraxia—i.e., his inability to perform certain purposeful movements—and the specific difficulties Mr. Loveland has with certain motor activities. This therapist also recounts how Mr. Loveland continues to have behavioral problems, which have improved somewhat, but not completely.

The Video then transitions to a recording of Mr. Loveland receiving treatment from another speech therapist. He receives praise from this therapist for writing his name correctly, and for writing the number "7" correctly, but the Video then shows how Mr. Loveland was unable to identify which of a rock, cotton, or a hamburger is "hardest." In the next clip, another occupational therapist discusses his left-hand dominance, and how his family is working on helping him to use his right arm more frequently

Another section of the Video shows a child—presumably one of Mr. Loveland's nieces—providing therapy to Mr. Loveland by quizzing him on words printed on colored note-cards. Mr. Loveland's sister then testifies that his condition will not likely improve very much in the future and that he will always need someone to make decisions for him and to help him with every aspect of his life.

The Video ends with Mr. Loveland's sister testifying that "one tire" changed Mr. Loveland's life, took his independence away, and affected all of their lives.

1837438v2

**ARGUMENT**

**I.      Standards Governing The Admissibility Of Day In The Life Videos.**

In addressing the admissibility of day-in-the-life videos, federal courts often apply a four-part analysis adopted in *Bannister v. Town of Noble, Okl.*, 812 F.2d 1265, 1269 (10th Cir. 1987). Under *Bannister*, a court must first consider whether the video "fairly represented the facts with respect to the impact of the injuries on the plaintiff's day-to-day activities." *Bannister*, 812 F.2d at 1269. For example, a film depicting a plaintiff in unlikely circumstances or performing improbable tests does not fairly portray a typical day in the plaintiff's life, has limited probative value, and increases the likelihood of unfair prejudice or confusion. *See id.* If, on the other hand, the video is limited to depicting a plaintiff's day-to-day life, the danger of unfair prejudice and confusion decreases, and the evidence's probative value increases. *See id*; *see also Jimenez v. United States,* No. 06 C 5943, 2008 WL 3849915, at *7 (N.D. Ill. Aug. 14, 2008) (admitting the portions of the video which show "ordinary day-to-day situations, because those situations are of the greatest probative value").

Second, a court should consider whether the plaintiff is aware of being videotaped for purposes of litigation, and whether that awareness "is likely to cause self-serving behavior, consciously or otherwise." *Bannister*, 812 F.2d at 1269. For example, exaggerated difficulty with an activity of daily life presents a danger of unfair prejudice at trial. Presenting this type of self-serving depiction, and presenting other depictions that "serve[] little purpose other than to create sympathy for the plaintiff," is "highly prejudicial." *Id.*

Third, a court should account for the "dominating nature of film evidence." *Id.* "The concern is that a jury will better remember, and thus give greater weight to, evidence presented in a

1837438v2

film as opposed to more conventionally elicited testimony. This, too, is a legitimate concern that must be recognized in determining the prejudicial effect of a "Day in the Life" film." *Id.*

Finally, a court should evaluate whether the video "could distract the jury because the benefit of effective cross examination is lost." *Id.* This concern may be mitigated if the plaintiff is available and subject to cross-examination at trial. *Id.*

II. **The Court Should Exclude The Day In The Life Video As Unfairly Prejudicial, Confusing, and Misleading Under Federal Rule of Evidence 403.**

Here, the first *Bannister* consideration weighs strongly in favor of exclusion of the Video. The vast majority of the Video comprises testimony from the Video's narrator, Mr. Loveland's mother and sister, and Mr. Loveland's therapists. For this reason alone, the Video does not fairly portray Mr. Loveland's day-to-day life, and thus fails at the task it was designed to achieve. *See Bannister*, 812 F.2d at 1269.

Other evidence which bolsters this conclusion includes the Video's depiction of the Tire, the accident scene, 911 calls, pictures and video of Mr. Loveland before the accident, and pictures of Mr. Loveland in a coma following the accident. *See Fuery v. City of Chicago,* No. 07 C 5428, 2015 WL 13682033, at *9 (N.D. Ill. Nov. 30, 2015) (excluding day in the life video that showed in graphic detail the plaintiff's immediate recovery from surgery, rather than footage showing how the plaintiff's "ordinary day-to-day activities" continued to be affected by his injuries).

The second *Banniser* consideration weighs in favor of exclusion too. There is no question but that the Video was prepared for litigation purposes. Given his condition, Mr. Loveland may not have been aware that the video was being taken, and was almost certainly unaware of its purpose, but the Video's creators certainly were. Their editorial decision-making—including footage of Mr. Loveland's wet sweatpants and footage of his young niece showing Mr. Loveland flashcards, for example—demonstrates that to a significant extent, the Video was specifically

7

designed to elicit sympathy from the jury on an improper basis. Any remaining doubt on this score is removed upon viewing the end of the Video, where Mr. Loveland's sister testifies that "one tire" caused "all of their lives to change, and took his independence away." Indeed, Mr. Loveland's sister's testimony, which focuses on the Tire at Issue, strongly echoes the Video's beginning—a picture of the damaged Tire on the truck at the scene of the accident. This exercise of editorial discretion reveals the Video's true purposes.

The third consideration from *Bannister* militates in favor of excluding the Video as well. Today, even more so than in 1987, when *Bannister* was issued, the concern over the dominating nature of video evidence is real and apparent. The Video serves as an object lesson for that concern. Through the Video, Plaintiffs essentially put on a significant portion of their case without giving Goodyear the opportunity to cross-examine any of the witnesses in real time. The Video has a narrative theme (beginning and ending with evidence about the Tire, though it purports to be a day-in-the-life film) and puts the evidence together for the jury in a manner in which juries rarely, if ever receive substantive evidence. More to the point, through its use of small personal moments interwoven throughout—the soiling of Mr. Loveland's sweatpants, a moment between Mr. Loveland and his mother where they touch fingers—the Video will play on the jury's emotions, and inflame their passions, like evidence taken in accordance with the Rules of Evidence would not.

Finally, Mr. Loveland will not be subject to cross-examination at trial. As such, the last *Bannister* factor weighs in favor of excluding the Video as well. Thus, all four factors identified in *Bannister* favor the exclusion of the Video from evidence in this case.

Taken together, these facts, and Plaintiffs' ability to call witnesses at trial—including Mr. Loveland's mother and sister, Mr. Loveland's doctors, and Mr. Loveland's therapists—merit the

8

exclusion of the Video from evidence at trial. *E.g.*, *Martinez v. Atchison, Topeka & Santa Fe Ry. Co.*, 869 F.2d 1497 (9th Cir. 1989) (affirming trial court's exclusion of day-in-the-life video as cumulative and redundant of in-court testimony from plaintiff's mother regarding the care she provided to the plaintiff on a daily basis); *Pages-Ramirez v. Hosp. Espanol Auxilio Mutuo De Puerto Rico, Inc.*, No. CV 07-1407 (JP), 2008 WL 11357891, at *2 (D.P.R. Apr. 29, 2008) (excluding video when witnesses were available to testify about the plaintiff's injuries and daily routine).

## III. The Court Should Exclude The Day In The Life Video As Inadmissible Hearsay.

The testimony included in the Video from Mr. Loveland, Mr. Loveland's mother, Mr. Loveland's sister, other members of Mr. Loveland's family, and Mr. Loveland's therapists constitute inadmissible hearsay, and the Video should be excluded for this reason.

Hearsay is an out-of-court statement offered at trial to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801. Absent an exclusion or exception, hearsay is inadmissible. Fed. R. Evid. 802.

Here, every verbal statement contained in the Video is an out-of-court statement. Plaintiffs are either offering these statements for the truth of the matter asserted, or to suggest to the jury that they render a verdict based on sympathy or inflamed passiions, rather than the facts and evidence in the case. Either way, these statements are inadmissible. *See Thompson v. TRW Auto. U.S., LLC,* No. 2:09-CV-1375-JAD-PAL, 2014 WL 2612271, at *3 (D. Nev. June 11, 2014) (refusing to allow audio of day-in-the-life video from being presented to the jury, but leaving open the possibility that certain parts of the video could be admissible).

9

Notably, Plaintiffs will not be prejudiced by the exclusion of these statements either, as, to the extent the testimony is otherwise admissible, Plaintiffs may elicit this testimony from live witnesses at trial. *Jimenez*, 2008 WL 3849915, at *7.

## CONCLUSION

For each of the foregoing reasons, Goodyear respectfully requests that the Court enter an Order barring Plaintiffs from introducing the "Day in the Life video of Shane Loveland" into evidence at trial.

GREENSFELDER, HEMKER & GALE, P.C.

By: /s/ Edward S. Bott, Jr.
Edward S. Bott, Jr.
Clark W. Hedger
Juliane M. Rodriguez
10 South Broadway, Suite 2000
St. Louis, MO  63102
(314) 241-9090
Fax:  (314) 345-5465
esb@greensfelder.com
ch1@greensfelder.com
jrodriguez@greensfelder.com

AND

BAIRD HOLM LLP
Jennifer D. Tricker (NE# 23022)
1700 Farnam Street, Suite 1500
Omaha, NE  68102-2068
(402) 344-0500
jtricker@bairdholm.com

*Attorneys for The Goodyear Tire & Rubber Company*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with NECivR 7.1(d)(3) and further certify that the word count function was applied to include all text, including the caption, headings, footnotes, and quotations. This document was prepared using Microsoft Word 2010 and contains 3,007 words.

/s/ Edward S. Bott, Jr.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was filed with the Clerk of the Court and served upon all attorneys of record using the CM/ECF system this 4th day of February, 2020.

Kyle W. Farrar
KASTER, LYNCH, FARRAR & BALL, LLP
1010 Lamar, Suite 1600
Houston, TX 77002
kyle@fbtrial.com

Paul E. Godlewski
SCHWEBEL, GOETZ & SIEBEN, P.A.
80 South 8th Center
5120 IDS Center
Minneapolis, MN 54402
pgodlewski@schwebel.com

Michael F. Coyle
FRASER, STRYKER LAW FIRM
409 South 17th Street
Suite 500, Energy Plaza
Omaha, NE 68102
mcoyle@fraserstryker.com

*Attorneys for Plaintiffs*

/s/ Edward S. Bott, Jr.

1837438v2