*EXHIBIT G*

# In the Matter of:

*Rysta Leona Susman, et al.*
*vs.*
*The Goodyear Tire & Rubber Company*

_____

*Craig H. Lichtblau, MD*
*April 8, 2019*

_____



Chicago, IL • 312.386.2000 • 800.868.0061

Page 25

1  half out. At the time that I saw him, she told me
2  he didn't go back to any more hospital admissions.
3  I don't know what's happened since the time I saw
4  him 'til now. And that's clinically significant.
5  He's not suffering from status epilepticus,
6  pneumonias, seizures, urinary tract infections,
7  autonomic storming. I have no reason to reduce his
8  life expectancy more than four years.
9      Q. As you sit here today, you don't know what
10 care he's received since you last saw the patient;
11 is that true?
12     A. Well, I had a pre-depo conference with the
13 plaintiff attorney. My understanding is the
14 mother's taking care of him, the family.
15     Q. Okay. Are you aware of any admissions to
16 the hospital since you last saw him?
17     A. No, I'm not aware of it. I mean, maybe it
18 happened, but I'm not aware of it.
19     Q. Are you aware of anything that would make
20 his condition unstable between -- anything that
21 happened since you last saw him that would make his
22 condition unstable?
23     A. Nobody's made me aware of that.
24     Q. Would you flip to the third page of
25 Exhibit G for me.

Page 26

1      A. Yeah.
2      Q. So the first paragraph in this -- on this
3  page refers to physical therapy that the patient
4  received from December of 2016 until June 8th of
5  2017. Do you see that?
6      A. Yes.
7      Q. It goes on to say, "The patient's mother
8  was informed they had done everything they could and
9  her son had plateaued. They did not feel that
10 ongoing therapy would improve his situation."
11         Did I read that correctly?
12     A. Yes.
13     Q. Tell me what you're trying to get across
14 in that sentence.
15     A. Well, I'm not trying to get across
16 anything. I'm just documenting this is history the
17 mother told me. But if you want to know -- forget
18 this case a second -- just how it works. If I admit
19 somebody to a rehab unit and I keep them there and
20 we're billing 1,200 to 1,500 dollars a day and
21 they've plateaued and I keep them there, it's
22 fraudulent billing. It would be called physician
23 overutilization.
24         Once he reaches MMI, they can't justify
25 keeping him there anymore. So she's telling you

Page 27

1  what happened, but I know what happened. What
2  happened was he reached -- he plateaued. He's doing
3  as good as he's going to get, what you've seen. And
4  the truth of the matter is, in traumatic brain
5  injury, the majority of your functional turn takes
6  place in the first six months. You can still
7  continue to improve a little bit another 18 months,
8  so you're 24 months out. The truth of the matter
9  is, there's no finish line to the treatment of
10 traumatic brain injury. But it's going to be very,
11 very subtle after 24 months.
12     Q. Do you agree -- do you have any reason to
13 dispute the fact that he had in fact plateaued?
14     A. Well, you know, I don't have an opinion
15 because that's not what I was asked to do. I wasn't
16 asked to really figure out if he received
17 appropriate care or not, because that would come
18 under appropriate care.
19         I was asked to -- looking at it, when I
20 went to see him, this is what I think he needs. I
21 didn't retrospectively look at whether he's
22 plateaued or not.
23     Q. Did you do any independent evaluation of
24 whether or not additional PT, OT or speech therapy
25 is necessary for this patient?

Page 28

1      A. Yes.
2      Q. We'll get to that later. But what is the
3  basis of your opinions -- what is the experiential
4  or educational basis for your opinions on PT, OT and
5  speech therapy?
6      A. The date of the injury was 5/1/15. I saw
7  him on 6/9/17, and I thought one more year would be
8  beneficial, because he's transitioned home and it
9  would -- it's no longer in a coordinated inpatient
10 setting under close medical supervision. So to
11 transition him, I said three times a week for one
12 year for each discipline, one, two, three, and
13 that's it; that's all he gets, he's done.
14     Q. So you're looking at a different section
15 in your report --
16     A. Yeah.
17     Q. -- but when you say three times a week for
18 one year and then PRN, that means as needed
19 afterwards?
20     A. Yeah, but the PRN doesn't count.
21 Economically it's not included. So it's three times
22 a week for one year, PT, OT and speech, really for
23 transition into the home.
24         Now, they wouldn't be coming into the
25 home. Hopefully, he would be in a situation where

## Page 45

1 that --
2    A. Yeah, but --
3    Q. -- is set up?
4    A. -- you have to realize, the problem with
5 mortality tables is, it's the general population,
6 all drinkers, all smokers, all risk takers; it's the
7 whole group.
8    Q. Right.
9    A. Life expectancy is -- the definition of
10 life expectancy -- well, let me clarify that.
11      The statistical definition of life
12 expectancy produced by statisticians, such as a
13 Shavelle and Strauss, talk about, it's the average
14 of the survival times of a specific patient
15 population.
16      What you can't do is walk in and say,
17 because of this group, this particular patient is
18 going to die at such and such a year. That gives
19 you the crystal ball and it puts you on the God
20 Squad. And it's speculation in a court of law. But
21 what you can do is talk about groups of population.
22      According to peer-reviewed published
23 literature, this patient will have a four-year
24 reduction in life expectancy due to the fact that
25 he's got a severe traumatic brain injury, and I'm

## Page 46

1 okay with that. I think that that's legitimate.
2    Q. Do you think that his risk of dying in any
3 given year would be increased, as opposed to the
4 general population?
5    A. No. I think that I would go by the
6 literature, and specifically, the National Research
7 Counsel Summary Golf War and Health, Volume 7,
8 Long-Term Consequences of Traumatic Brain Injury,
9 Washington D.C. This is the National Academy of
10 Press 2008. They said, based on their research --
11 and this is government funded. This is as good as
12 it gets. They did this with our servicemen,
13 veterans. They said, four years. I have no reason
14 to disbelieve that, so that's what I'm going to go
15 with. It's peer-reviewed, published, accepted.
16 That's the best I can do.
17    Q. The next paragraph in your -- on page 7 of
18 Exhibit G, which is your summary report, goes on to
19 identify some increased risks that Mr. Loveland is
20 exposed to because of his TBI. Do you see that?
21    A. Yes.
22    Q. Can you identify for me what these
23 increased -- what he's at an increased risk for?
24    A. Yeah. Increased risk for traumatic brain
25 induced epilepsy, Parkinsonism, Alzheimer's-like

## Page 47

1 dementia. So I agree, there are increased risks for
2 all those thing, but I can't say it's more probable
3 than not that he's going to have them.
4    Q. If he does have -- if he does have any of
5 these -- would you consider these complications or
6 something separate from that?
7    A. Yeah, they're a complication of a
8 traumatic brain injury, but if you have Parkinson's,
9 you control it with medications. And dementia-type
10 doesn't mean Alzheimer's.
11      So I wouldn't say it's going to reduce his
12 life expectancy anymore. I would just say it's
13 going to make his life miserable.
14    Q. So you don't see -- if you assume for the
15 sake of argument that Mr. Loveland did experience
16 traumatically-induced epilepsy, you see no drop in
17 his life expectancy in the event that he does
18 experience that complication?
19    A. Well, no, it depends. It depends if he's
20 getting appropriate aide and attendant care.
21 Because if that's the case, then he would have to
22 have RN and LPN level of care and they can put
23 Diastat in his rectum, because they are allowed to
24 pass meds, and they would have early detection and
25 early intervention. However, if he doesn't have

## Page 48

1 early detection and early intervention, well then,
2 yeah, you can reduce his life expectancy, because
3 you can die from seizures.
4    Q. What about Parkinsonism?
5    A. Well, that's not Parkinson's disease.
6 Parkinsonism means that, you know, he has the
7 shaking and the bradycardia slowness of gait and
8 slowness of movement, masked face, yes.
9    Q. If he ultimately suffers from that, would
10 that impact his life expectancy?
11    A. Probably not, not any more than the four
12 years.
13    Q. What about Alzheimer's-like dementia?
14    A. Again, that would just make taking care of
15 him more complicated.
16    Q. But in your judgment, it wouldn't impact
17 his life expectancy.
18    A. Well, it's going to impact his life
19 expectancy due to the fact that he's going to reduce
20 it by four years.
21    Q. You also go on to state that the brain
22 injury that he suffered increases his potential to
23 develop hydrocephalus in the future?
24    A. Correct, but I can't swear to more
25 probable than not. It's a possibility. And he has

Page 49

a shunt placed anyway, so probably not. That's in the literature. I don't pick and choose out of literature because that's not right. I go ahead and print the whole thing, and that's in the literature. But he has a VP shunt, so he's probably not going to have that, because that's what the VP shunt is treating right now.

Q. The last, I guess, additional risk that you identify in this paragraph is, he's at a lifetime risk for multiple organ system failure.

A. Yes.

Q. Can you describe that?

A. It was in the article.

Q. Okay.

A. You know, if he's on medications, then you're at risk for complications with your liver or complications with your kidney, because everything's filtered -- all the blood is filtered by the liver and the kidneys.

Q. Is it fair to say, that if he does suffer from multiple organ system failure, that that would in fact impact his life expectancy?

A. Yes, but that's a possibility, not a probability.

Q. What about -- well, I'll go one at a time.

Page 50

Does traumatically induced epilepsy increase his risk for being hospitalized?

A. It could increase risk, but it doesn't meet legal threshold of more probable than not.

Q. Okay. Would your answer be the same for Parkinsonism?

A. Yes.

Q. Would your answer be the same for Alzheimer's-like dementia?

A. Yes. It's an increased risk probably 10 to 20 percent, but I can't say it's greater than 50 percent. That doesn't meet legal threshold.

Q. Okay. Same for hydrocephalus?

A. Well, I doubt that's going to happen because he already has a shunt.

Q. And the same, the multiple organ system failure?

A. Right. Very low probability.

Q. Before we move on, let's look at the last page, page 8 of your summary report, which is Exhibit G.

So you state that this patient's future medical care, support services and durable medical equipment are defined in the continuation of care section of this report. This medical necessity and

Page 51

costs for these items are based on -- then you list five or six things.

So are these five and six things what you rely on in formulating your continuation of care?

A. Yes, plus knowledge, training, clinical practice experience, which exceeds over 130,000 hours, and the peer-reviewed published literature backing up all my opinions.

And you'll notice I did speak to the patient's treating neurologist and the patient's treating primary care physician. We had a conversation. And the neurologist actually faxed it back and signed it, signed it 6/30/17. The primary care physician never signed -- he didn't sign it and send it back, so I assume that he was fine with what exactly was said.

But, basically, these are my opinions. It just so happens that the primary care physician and neurologist agrees with my same opinions, because this patient is catastrophically injured.

And this comports with the protocol that's been peer-reviewed, published and accepted worldwide that was authored by me. And that's why we do it that way, to have accuracy at a premium. There's no fluff and puff in the report. I don't have therapy

Page 52

visits to Disney World, I don't have hyperbaric oxygen, I don't have hippo therapy. I don't have any fluff and puff.

What's in this report is written in such a way, which I think is a medical necessity to keep this patient as safe as possible. And to make sure there's nothing far reaching in the report and to make sure that there's no hocus pocus in the report, you'll notice, when I write a PRN, it does not meet legal threshold. So this cost is not included in the economic analysis. So if you go to page number 2, basically everything is out where it says PRN. And page number 3, that whole section, diagnostics is out, when it says one time a year/PRN, or PRN.

And when you go to page number 4, I dropped out 1 million to $4 million -- or, I shouldn't say, I drop out. I don't include 1 million to $4 million worth of care, 'cause I do make the speculative assumption in this court of law that we live in the perfect world and he'll never have a complication. So I don't include 1 million to $4 million worth of care. But let's say he does have a complication, such as seizures, has to be admitted, there's no money associated with the admissions to the hospital.

## Page 57

well, not die.
BY MR. HEDGER:
Q. So there's not a risk of, you know, obtaining a staph infection from being admitted into the hospital or other hospital?
A. There's always a risk, but it doesn't meet legal threshold of greater than 50 percent probability.
Q. Okay.
A. And remember, in my thing, it's always risk versus reward.
And in the courtroom arena, in order for me to say it under oath, it's got to be greater than 50 percent probability.
Q. While we have your old methodology in front of us, let me just ask you a few questions so we don't waste any time here.
So the third paragraph down, it says, "In my medical opinion, that these costs do not take into account the costs which are associated with various complications."
A. Right. And that's in the section that I had that I said, I'm not including 1 million and $4 million worth of care because I'm going to make this speculative assumption in a court of law that

## Page 58

we live in a perfect world and -- you know, and he's not going to have any problem.
Q. But these are all complications that he is at risk for?
A. Yeah. But, I mean, he's at risk, but it's not -- doesn't meet anywhere near legal threshold.
(Interruption in the proceedings.)
BY MR. HEDGER:
Q. All right. Back to what we've marked as Exhibit H. I assume the continuation of care portion is not going to change?
A. No, it's not. And you'll notice the cardiology, orthopedic surgeon, gastroenterologist. There's no costs included in an economic analysis because it's a PRN. The neurologist is two to four times a year and PRN. The and PRN is not included. It's only two to four times a year. But I'm not a life care planner, I'm a medical doctor, and that's why I write it this way. This is complete, but yet follows the rules of the court by speculation.
Q. Do you know the last time -- let's start with neurologist. Do you know the last time he saw a neurologist?
A. I have no idea, but that's irrelevant. What's relevant to me is this is what I

## Page 59

think he needs because he's had a catastrophic brain injury. Whether he's getting it, that's a completely different set of circumstances. And I haven't seen him in a year and a half, so I have no knowledge.
Q. But at the time that you saw him, was it your medical opinion that he needed to see a neurologist?
A. Yes, he should be followed by a neurologist. He's had a severe brain injury, he's on -- let me see if he's on antiseizure medications. I don't know what he's on.
He's on Prozac, Amantadine, a blood thinner, Risperidone, Depakote, Tramadol, trazodone. I mean, he should see a neurologist.
Depakote is an antiseizure medication. He's getting 125 milligrams, four in the morning, four midday and two at night. That can affect your liver, your kidneys. It can also affect your blood marrow. And your blood marrow is where your red cells, your white cells and your platelets are built and sent out into the bloodstream. He should be monitored by a neurologist and a primary care physician at a minimum.
Q. You have an asterisk by neurologist.

## Page 60

A. Yeah.
Q. That refers to, I guess, something that Dr. Morgan Laholt, who's -- was that his treating neurologist?
A. Yes. In other words, I called him to confirm the prices and confirm how often he wanted to see him.
These are my opinions. It just so happens, whenever I can get ahold of a treater to confirm or deny, I will go ahead and do that to accuratize this. That's part of my protocol, which is different than a physician life care planner of that crew out in Texas.
Q. Lots of anti-Texas talk today.
A. No, it's not. It's -- I believe it should be done with a medical model, not a business model.
Q. I'm just joking.
A. Yeah. I like Texas.
THE WITNESS: Off the record.
(Discussion off the record.)
MR. HEDGER: Back on the record.
BY MR. HEDGER:
Q. All right. So we started out with the neurologist. We're on page 1, continuation of care, which is I think --

15 (Pages 57 to 60)

61

1 (Interruption in the proceedings.)
2 (Marked for identification is Defense
3 Exhibit I.)
4 BY MR. HEDGER:
5 Q. Doctor, I've just been handed I guess a
6 folder that your office just brought in. Can you
7 identify that for the record?
8 A. Yes. That is the updated methodology page
9 and updated literature that I was talking about to
10 back up my opinions about hip fractures.
11 Q. Okay. Let's return to Exhibit H, which is
12 the continuation of care.
13 So, Dr. Laholt, you reference -- you have
14 an asterisk by neurologist you reference, that's per
15 your conversation with Dr. Laholt?
16 A. Yeah, that price comes directly from a
17 treater.
18 Q. Okay. So you're talking about the price?
19 A. Yes.
20 Q. Because Dr. Laholt recommended two to
21 three times a year and you recommend two to four
22 times a year?
23 A. Correct.
24 Q. So you disagree with him about -- a little
25 bit about the number of times per year?

62

1 A. No, because it's a range of two to four.
2 Q. Okay. Which would include three?
3 A. Yeah, which would include three.
4 Q. Let's flip to the section, Diagnostic
5 Tests.
6 A. Yeah, that would be page No. 2. And it's
7 a moot point, because, look, it's, PRN, PRN, PRN,
8 which means it's not included.
9 Q. Okay. So let's jump up to medical care,
10 continued on that page, page 2?
11 A. Yeah, this ENT and the neurosurgeon is not
12 included.
13 Q. So the primary care and the urologist is
14 all we care about then?
15 A. Correct.
16 Q. So the primary care, you list the range of
17 100 to four hundred dollars, and that's per Chadd
18 Murray.
19 A. Correct.
20 Q. Is that the plaintiff's primary care
21 physician?
22 A. Yeah. Well, it was at that time.
23 Q. Okay. Does four hundred bucks for an
24 office visit seem high to you?
25 A. It is, but if he's complicated -- let's

63

1 say, he gets sent to the emergency room because of
2 X, Y and Z, that's why it would be -- that's why
3 it's a range.
4 Q. Do you have a sense of -- can you weight
5 this one hundred to four hundred dollar per office
6 visit in any way, given the likelihood that he has
7 one of those complications?
8 A. No, because it's speculative. All I can
9 say is, Look, it's two to four times a year, it's
10 one hundred to four hundred. That's why I always
11 tell the economists, Do a range high to low.
12 Q. Speaking of that, did you talk to the
13 economist on this case?
14 A. I don't know who it was.
15 Q. Pettingill.
16 A. Probably, but I don't document it. I take
17 so many calls a day. But he knows -- I've worked
18 with him in the past and he knows how to do my
19 reports. He knows when it's a PRN and it's not
20 included.
21 Q. So you have no specific recollection of
22 talking to Pettingill about this particular report?
23 A. No, I don't remember. But if he says
24 under oath that we did, we probably did.
25 Q. Now let's go to the diagnostic tests.

64

1 Let's just talk about the first one.
2 X-ray thoracolumbar?
3 A. Doesn't count. One time a year/PRN. All
4 of that, that whole section there, is not included.
5 Q. Not even the one time a year; I thought
6 that was normally included?
7 A. That one time a year/PRN, doesn't meet
8 legal threshold. So none of that's included in that
9 economic analysis.
10 Q. So anytime you have a one time a year or
11 two time a year slash PRN then it's not included?
12 A. Correct.
13 Q. What's the purpose of putting that into
14 the report then if it's not included?
15 A. Because I'm a medical doctor. I'm not a
16 life care planner. I'm not a physician life care
17 planner.
18 This is done as accurate as I can and I
19 follow the rules of the court; no speculation. But
20 it's there because realize that it's possible he
21 would need it, but I'm not saying it's probable.
22 Q. And that's the same for any one of these
23 where there's a slash PRN?
24 A. I agree. So really, like, page No. 4, all
25 of that is out; there's nothing included there.