*EXHIBIT H*

# In the Matter of:

*Rysta Leona Susman, et al.*
*vs.*
*The Goodyear Tire & Rubber Company*

---

*Bernard F. Pettingill, Jr., PhD*
*April 9, 2019*

---



Chicago, IL • 312.386.2000 • 800.868.0061

Bernard F. Pettingill, Jr., PhD - 4/9/2019

Page 5

1  THEREUPON:
2          BERNARD FRANCIS PETTINGILL JR.,
3  being by me first duly sworn or affirmed to tell the
4  truth, the whole truth, and nothing but the truth, as
5  hereinafter certified, responded and testified as
6  follows:
7          THE WITNESS: I do.
8              DIRECT EXAMINATION
9  BY MR. HEDGER:
10     Q.  Dr. Pettingill, my name is Clark Hedger.  I'm
11  an attorney representing the Goodyear Tire & Rubber
12  Company.  We are here today to take your deposition in
13  a matter styled Rysta Susman, et al. v. Goodyear Tire &
14  Rubber Company.
15      I understand you have been designated as an
16  expert in this case?
17     A.  Correct.
18     Q.  Is that your understanding?
19     A.  Yes.
20     Q.  Before the deposition began -- well, strike
21  that.
22      Let's mark the first document which has been
23  premarked Exhibit A.
24      (Exhibit A marked for identification)
25     Q.  Have you seen this document before?

Page 6

1     A.  Yes, it is in my file, in the file in front of
2  you.  This is what I was concerned about, the last two
3  pages.
4     Q.  For the record the witness is pointing to
5  pages 4 and 5 of Exhibit A, which is the notice of
6  deposition for today.
7      Sir, to the best of your ability have you
8  provided us with all the documents sought on this
9  Exhibit A?
10     A.  Yes, sir.
11     Q.  You handed us some documents before the
12  deposition started.  I just want to go over them
13  briefly with you.
14          MR. HEDGER:  Can we mark these as group
15     Exhibit C.
16          (Exhibit C marked for identification)
17     Q.  For the record we have marked group Exhibit C,
18  about two inches of documents that you handed to me
19  prior to the deposition, is that correct?
20     A.  Correct, yes, sir.
21     Q.  The first set of documents I see in this group
22  Exhibit C is a document entitled "History of Present
23  Illness."  Do you see that, sir?
24     A.  Yes, sir.
25     Q.  Is this part of the report from Dr. Lichtblau?

Page 7

1     A.  Correct, it is.
2     Q.  The second page I see in this set of group
3  Exhibit C is "Continuation of Care," is that another
4  part of Dr. Lichtblau's report?
5     A.  Yes, sir.  I want to preface one thing and
6  there is no question.  Everything you see written,
7  handwritten notes, underlined, circled, emphasized is
8  all me.  I don't have any assistants.  I don't have any
9  partners.  I have no one, except my wife who answers
10  the phone.  So everything you see on there is all my
11  work product.
12     Q.  I'll note for the record that on page 2 of
13  Exhibit C there are handwritten notes and what's
14  handwritten to the right side of the fourth column,
15  these are your handwritten notes?
16     A.  Yes, sir, they are.
17     Q.  Anytime I see handwritten notes on any of
18  these documents these are your handwritten notes?
19     A.  Exactly, yes, sir.
20     Q.  So this continuation of care document which is
21  part of Exhibit C, is this what served as the basis for
22  your expert report?
23     A.  Exactly, plus conferences and discussions with
24  Dr. Lichtblau, of course.
25     Q.  The last page of this first set of Exhibit C,

Page 8

1  can you identify what that is for me?
2     A.  Sure.  Earnings info, which I draw an arrow,
3  would normally be inserted in the background section of
4  the report just to indicate to me that it is going to
5  go into the background.
6      Many times I get records and don't put them in
7  the background because they aren't significant, but
8  I've entered that into the background section, and
9  that's on page 4 of my report.
10     Q.  For the record these are Shane Loveland's
11  earnings -- strike that.
12      This is information about Shane Loveland's
13  earnings that you used to calculate his lost wages?
14     A.  Yes, sir, correct.
15     Q.  Then the rest of Exhibit C appears to be --
16  well, another big chunk of Exhibit C appears to be your
17  expert report in this case, is that correct?
18     A.  Yes, sir, correct.  And for purposes of this
19  deposition I did not print it front and back because I
20  thought you might want to make copies.
21     Q.  So I have copies, so we are good on that.  I
22  also see the notice of deposition for this deposition,
23  is that correct?
24     A.  Yes, sir.
25     Q.  I see an invoice?

Bernard F. Pettingill, Jr., PhD - 4/9/2019

17

work?
A. Exactly.
Q. How many cases either pre-litigation or post litigation do you work on in a year?
A. That's a good question. About ten percent of the cases are in pre-litigation and I do about a hundred cases a year, I would say. A few more, a few less, but about a hundred I'd say on acknowledge. That doesn't mean I write reports for a hundred. I might look at a hundred and write reports for 70 or 50 but I'm looking at reports for about a hundred year, correct.
Q. Your hourly rate is $450 an hour?
A. Correct, for everything.
Q. So that doesn't fluctuate for time when you are testifying in trial?
A. Nothing other than 450. It is too complicated. I don't charge for late payments. I don't charge interest for monthly compounding interest if you don't pay me on time. I don't have the energy to track that. So I bill 450 and hope to get paid. That's how it works.
Q. Do you bill 450 for travel time?
A. Portal to portal, the minute I leave my office, correct.

18

Q. Do you know how many hours you have billed to this case?
A. Minimal. Five, six maybe. I read the lady's deposition, mother's deposition, I think five to six hours. The report was covered in the retainer and I've done a few extra documents after that.
Q. You mentioned earlier that the retainer was 1800?
A. Correct.
Q. If this case goes to trial what additional fees do you expect to charge?
A. I'm going to read Dr. Lichtblau's deposition and have another conference with him. I had one already. I expect to meet the client so I'll probably have to arrive a few hours early because I don't ever go to court without meeting the client. I've done that for 30 years and I've always met the client. The third thing would be to update the report to reflect the current trial date and the current discount rate, which could change tomorrow.
Q. In your own words what do you understand that you've been hired to do in this case?
A. My main job is to reduce to present value the future care needs of Shane Loveland and to put that in a format where the jury can understand the numbers and

19

I can simply explain things like medical inflation, general inflation, discounting.
Why I put the charts in here is because I'm going to show these to the jury at trial. I'm talking about pages 58 through 63. That's it, simply stated.
Q. Can you give us a working definition of present value?
A. Sure. Present value represents the sum of money needed at some fixed time -- almost instantly in this case -- to fund or finance the future needs of Shane so that the money would be drawn out of that present value fund as needed by Shane at the end of his lifetime, whether that's a normal life expectancy or reduced life expectancy, that money is reduced to zero.
In other words, every single penny in this plan is assumed to be needed over the next 37 years and at that point in time there's nothing in the fund. If he needs another aspirin the day after this money runs out there's nothing there, if he's alive after 37 years, there's nothing in the fund.
Q. You mentioned a couple of times your conference with Dr. Lichtblau that you have had?
A. Correct.
Q. Tell me what you and Dr. Lichtblau talked about?

20

A. Sure. Most importantly Dr. Lichtblau customarily has three models, best, worst and most probable. He didn't do that in this case. He just did one model, which I thought was unusual. He rarely does one model.
So that's why I called him. I said, what happened in best, worst and most probable? He said not needed. The most important point is the aide and attendant care is being provided. It's being provided for the most part by his mother but that's going to change. And he needs aide/attendant care which is the majority of numbers as you know.
Q. Did he explain why a best/worst/middle case was appropriate?
A. I didn't probe on that, no. I don't know. I didn't go any further than that. He explained it and let it go.
Q. How long do you think you talked to him?
A. Fifteen minutes.
Q. Did you take any notes of that conversation?
A. No, and I don't bill for it. So it's customary. That's another part of what I do regularly. If I do a life care plan analysis I have to talk to the life care planner. I don't go to trial without making a point to talk to him.

Bernard F. Pettingill, Jr., PhD - 4/9/2019

21

1  Q. Did you talk to him about whether to include
2  medical care or other services that he had marked PRN
3  in his report?
4  A. Good question. I sure did. The as-needed
5  items, PRN items are not calculated. If he said once a
6  year and as needed, I did as needed. I didn't nothing
7  else with the PRNs, nothing, zero. That may change
8  between now and trial.
9      If we have a year I'm sure some of those PRNs
10 will be needed and some of the things that will are
11 needed now will become PRNs, no question. You'll see a
12 different report in a year from now, no question.
13 Medications will change too.
14     Dr. Lichtblau, by the way, does not use
15 generic drugs in any of his reports, none. There are
16 drugs in here that he could substitute that would drop
17 the price of that drug 80 percent. He won't do it.
18 I've had the discussion with him before, he will only
19 use brand drugs.
20 Q. I want to focus your attention on Section 3.1
21 of your report now.
22 A. Yes.
23 Q. What did you determine -- that's on page 5 --
24 A. Got it.
25 Q. What did you determine Mr. Loveland's life

22

1  expectancy to be?
2  A. 37.30 years.
3  Q. Above that 37.30 years there's the word
4  reduced appears, do you see that?
5  A. That's correct.
6  Q. What does that account for?
7  A. Dr. Lichtblau.
8  Q. So do you know what your starting figure was
9  to arrive at this reduced number of 37.3?
10 A. I don't know.
11 Q. Do you know --
12 A. That was Dr. Lichtblau's decision.
13 Q. Is it fair to say then that you didn't make an
14 independent evaluation of his life expectancy?
15 A. Correct.
16 Q. So for whatever life expectancy is identified
17 in your report that's something that comes directly
18 from Dr. Lichtblau?
19 A. Correct.
20 Q. Do you consider yourself an expert in life
21 expectancy?
22 A. No. I wouldn't attempt to go there. I could
23 read the literature. I know the literature inside and
24 out, but I'm not an expert, never. That calls for a
25 medical opinion.

23

1  Q. Just to put a bow on that, so you reduced
2  Mr. Loveland's life expectancy exactly as much as Dr.
3  Lichtblau indicated it should be reduced?
4  A. Yes, sir, correct, one hundred percent
5  correct.
6  Q. Do you have any opinions on how Mr. Loveland's
7  current condition impacts his life expectancy?
8  A. No, that's really going to be the $64,000
9  question. That's really a medical decision.
10 Q. Let's pop over to Section 4.2, which is on
11 page 6 of your report which we have marked as Exhibit
12 B.
13 A. Yes, sir.
14 Q. You chose an income growth rate of 2.59
15 percent, is that correct?
16 A. Actually that's the most conservative growth
17 rate I could find, correct.
18 Q. Can you explain what an income growth rate is?
19 A. Sure. Historically wages track inflation. No
20 question about it. Some years they are a little
21 higher, some years lower. But we would not have any
22 employees in the United States if we didn't at least
23 keep their income stream up with inflation.
24 Productivity measures go above inflation. So if you
25 see on the news that wages went up 3.7 percent, bundled

24

1  in 3.7 is a productivity factor.
2      I didn't factor in any productivity factor.
3  This is strictly inflation. This is the kind of
4  approach I would take if I was hired by the defense
5  firm. It is the most conservative growth. I could
6  have tried to track what his income over the years had
7  been in terms of starting and ending date or track it
8  according to the kind of work he does and look at some
9  handbook that would track that. I didn't do that. I
10 simply used CPI.
11 Q. Can you explain what CPI is?
12 A. Sure. It's made up of a basket of goods and
13 services measured in 95 locations twice a year and in
14 that basket are items that the average consumer uses,
15 including eight categories.
16     I don't want to try to remember all of them
17 but there are eight separate categories. The items in
18 the basket change very irregularly, very infrequently
19 but they do change and we can link those all the way
20 back to the 1920s to see how inflation has grown given
21 this basket of goods and services called the CPI.
22 Q. You specifically used the CPI 30-year growth
23 rate, is that correct?
24 A. Correct.
25 Q. What is specifically the CPI growth rate?

Epiq Court Reporting Solutions - Chicago
312.386.2000