*EXHIBIT I*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CASE NO.: 8:18-CV-00127

RYSTA LEONA SUSMAN, both
individually and as Legal
Guardian of SHANE ALLEN
LOVELAND, et al.,

        Plaintiff,

vs.

THE GOODYEAR TIRE & RUBBER
COMPANY,

        Defendant.
_____/

DEPOSITION OF

CRAIG H. LICHTBLAU, M.D.

Monday, April 8, 2019
4:49 p.m. - 6:41 p.m.

Offices of Craig H. Lichtblau, M.D.
550 Northlake Boulevard
North Palm Beach, Florida 33408

Stenographically Reported By:
Shirley D. King, CRR, FPR, RPR
Certified Realtime Reporter

1    So the way I put this together, in
2 answering your question, yes, some of this, it will
3 be consistent in other reports with neurologic
4 catastrophic patients, but protocols change all the
5 time, medications change all the time. And
6 depending upon the patient's clinical status, that
7 they may not have all sections of the specific
8 report in it, in each report.
9    Q.   Okay.  Thank you.
10        MR. HEDGER:  Can I have this marked as
11   Exhibit G.
12        THE WITNESS:  Do you want to go off the
13   record?
14        MR. HEDGER:  Sure.
15        (Marked for identification is Defense
16   Exhibit G.)
17 BY MR. HEDGER:
18   Q.   Sir, I've handed you what's been marked
19 Defendant's Exhibit G.  Do you recognize that
20 document?
21   A.   Yes.  That's my summary report.
22   Q.   And you testified earlier that your
23 summary report is what exactly?
24   A.   It just adds life expectancy.  You have to
25 use peer-reviewed published literature.  And you'll

1  notice I went ahead and reduced his life expectancy
2  by four years, which you kind of have to because
3  this is a major catastrophic injury.  However, he is
4  walking and he's not fit by a G-tube, so you'd only
5  reduce it by four years.  And this has basically
6  been peer-reviewed published and accepted.
7       Q.   All right.  We'll get there.  I'm going to
8  start at the beginning of the report.
9       A.   Okay.
10      Q.   In the second paragraph, you say the
11 patient's mother stated her son was in a normal
12 state of health until May 1st, 2015.  Do you see
13 that in there?
14      A.   Yes.
15      Q.   Was this the sum total of your review of
16 information pre-accident?
17      A.   I think so.  Let's see.  The accident took
18 place on 5/1/15 and my first record is on 5/1/15.  I
19 think that's correct.
20           I don't really have any knowledge of any
21 preexisting bad problems that he had or medical
22 problem.  Let's see if it's in the past medical
23 history.
24           He had a fracture of his right foot.
25 That's all I know.  I don't think he had any

Craig H. Lichtblau, MD - 4/8/2019

43

He'll hit somebody. He'll scream profanity at somebody's girlfriend and the boyfriend will hit him in the head, hit him with a tire iron or something. He can't be mixed in the regular population. He doesn't know what he's doing; can't be held accountable.

Q. So you referenced this already, but in the next paragraph it says, "There is a statistical reduction in life expectancy of patients who have suffered from a severe traumatic brain injury, and this estimated average life expectancy reduction is approximately four years."

Did I read that correctly?

A. Yes.

Q. So this looks like an average. Why did you pick the average number of years?

A. Because you can't go higher and you can't go lower. I'm saying, look, he's got a clinically significant reduction in life expectancy. And that's based on literature. I mean, I have 18 peer-reviewed published articles talking about life expectancy and traumatic brain injury. And some people say seven, some people say four, some people say less, some people say more. I would go with four years. And I think that's fair and reasonable

Epiq Court Reporting Solutions - Chicago
312.386.2000

1   because he can walk, he can talk, he's not fed by a
2   G-tube.
3            Now, if he was immobile in a bed and fed
4   by a G-tube, it would be different, but he's
5   walking.
6       Q.   Do these articles lay out sort of
7   additional complications that would make the
8   reduction in life expectancy higher?
9       A.   Yes, some of them do.  If he was suffering
10  from aspiration pneumonia, urinary tract infection,
11  seizures, his mortality would be faster.
12      Q.   Do you know off the top of your head how
13  much that would reduce his life expectancy?
14      A.   No.  No, I don't.  And I wouldn't
15  speculate in a court of law.
16           All I can say is, I'm going to concede in
17  a court of law that he does have a reduction based
18  on the fact that he had a severe traumatic brain
19  injury and it's four years.  That I'll concede to.
20  More than that or modifying that, I can't do that.
21      Q.   Are you familiar with mortality tables?
22      A.   Yes.
23      Q.   And sometimes mortality tables identify
24  the risk of -- the risk of any one person dying in
25  any one span of time.  Are you familiar with how

1  okay with that.  I think that that's legitimate.
2     Q.   Do you think that his risk of dying in any
3  given year would be increased, as opposed to the
4  general population?
5     A.   No.  I think that I would go by the
6  literature, and specifically, the National Research
7  Counsel Summary Golf War and Health, Volume 7,
8  Long-Term Consequences of Traumatic Brain Injury,
9  Washington D.C.  This is the National Academy of
10 Press 2008.  They said, based on their research --
11 and this is government funded.  This is as good as
12 it gets.  They did this with our servicemen,
13 veterans.  They said, four years.  I have no reason
14 to disbelieve that, so that's what I'm going to go
15 with.  It's peer-reviewed, published, accepted.
16 That's the best I can do.
17    Q.   The next paragraph in your -- on page 7 of
18 Exhibit G, which is your summary report, goes on to
19 identify some increased risks that Mr. Loveland is
20 exposed to because of his TBI.  Do you see that?
21    A.   Yes.
22    Q.   Can you identify for me what these
23 increased -- what he's at an increased risk for?
24    A.   Yeah.  Increased risk for traumatic brain
25 induced epilepsy, Parkinsonism, Alzheimer's-like

1 dementia.  So I agree, there are increased risks for
2 all those thing, but I can't say it's more probable
3 than not that he's going to have them.
4     Q.   If he does have -- if he does have any of
5 these -- would you consider these complications or
6 something separate from that?
7     A.   Yeah, they're a complication of a
8 traumatic brain injury, but if you have Parkinson's,
9 you control it with medications.  And dementia-type
10 doesn't mean Alzheimer's.
11          So I wouldn't say it's going to reduce his
12 life expectancy anymore.  I would just say it's
13 going to make his life miserable.
14     Q.   So you don't see -- if you assume for the
15 sake of argument that Mr. Loveland did experience
16 traumatically-induced epilepsy, you see no drop in
17 his life expectancy in the event that he does
18 experience that complication?
19     A.   Well, no, it depends.  It depends if he's
20 getting appropriate aide and attendant care.
21 Because if that's the case, then he would have to
22 have RN and LPN level of care and they can put
23 Diastat in his rectum, because they are allowed to
24 pass meds, and they would have early detection and
25 early intervention.  However, if he doesn't have

1 early detection and early intervention, well then,
2 yeah, you can reduce his life expectancy, because
3 you can die from seizures.
4  Q. What about Parkinsonism?
5  A. Well, that's not Parkinson's disease.
6 Parkinsonism means that, you know, he has the
7 shaking and the bradycardia slowness of gait and
8 slowness of movement, masked face, yes.
9  Q. If he ultimately suffers from that, would
10 that impact his life expectancy?
11  A. Probably not, not any more than the four
12 years.
13  Q. What about Alzheimer's-like dementia?
14  A. Again, that would just make taking care of
15 him more complicated.
16  Q. But in your judgment, it wouldn't impact
17 his life expectancy.
18  A. Well, it's going to impact his life
19 expectancy due to the fact that he's going to reduce
20 it by four years.
21  Q. You also go on to state that the brain
22 injury that he suffered increases his potential to
23 develop hydrocephalus in the future?
24  A. Correct, but I can't swear to more
25 probable than not. It's a possibility. And he has

1  a shunt placed anyway, so probably not.  That's in
2  the literature.  I don't pick and choose out of
3  literature because that's not right.  I go ahead and
4  print the whole thing, and that's in the literature.
5  But he has a VP shunt, so he's probably not going to
6  have that, because that's what the VP shunt is
7  treating right now.
8       Q.   The last, I guess, additional risk that
9  you identify in this paragraph is, he's at a
10 lifetime risk for multiple organ system failure.
11      A.   Yes.
12      Q.   Can you describe that?
13      A.   It was in the article.
14      Q.   Okay.
15      A.   You know, if he's on medications, then
16 you're at risk for complications with your liver or
17 complications with your kidney, because everything's
18 filtered -- all the blood is filtered by the liver
19 and the kidneys.
20      Q.   Is it fair to say, that if he does suffer
21 from multiple organ system failure, that that would
22 in fact impact his life expectancy?
23      A.   Yes, but that's a possibility, not a
24 probability.
25      Q.   What about -- well, I'll go one at a time.

1  Does traumatically induced epilepsy
2  increase his risk for being hospitalized?
3      A.  It could increase risk, but it doesn't
4  meet legal threshold of more probable than not.
5      Q.  Okay.  Would your answer be the same for
6  Parkinsonism?
7      A.  Yes.
8      Q.  Would your answer be the same for
9  Alzheimer's-like dementia?
10     A.  Yes.  It's an increased risk probably 10
11 to 20 percent, but I can't say it's greater than
12 50 percent.  That doesn't meet legal threshold.
13     Q.  Okay.  Same for hydrocephalus?
14     A.  Well, I doubt that's going to happen
15 because he already has a shunt.
16     Q.  And the same, the multiple organ system
17 failure?
18     A.  Right.  Very low probability.
19     Q.  Before we move on, let's look at the last
20 page, page 8 of your summary report, which is
21 Exhibit G.
22          So you state that this patient's future
23 medical care, support services and durable medical
24 equipment are defined in the continuation of care
25 section of this report.  This medical necessity and

1  visits to Disney World, I don't have hyperbaric
2  oxygen, I don't have hippo therapy.  I don't have
3  any fluff and puff.
4              What's in this report is written in such a
5  way, which I think is a medical necessity to keep
6  this patient as safe as possible.  And to make sure
7  there's nothing far reaching in the report and to
8  make sure that there's no hocus pocus in the report,
9  you'll notice, when I write a PRN, it does not meet
10 legal threshold.  So this cost is not included in
11 the economic analysis.  So if you go to page number
12 2, basically everything is out where it says PRN.
13 And page number 3, that whole section, diagnostics
14 is out, when it says one time a year/PRN, or PRN.
15             And when you go to page number 4, I
16 dropped out 1 million to $4 million -- or, I
17 shouldn't say, I drop out.  I don't include
18 1 million to $4 million worth of care, 'cause I do
19 make the speculative assumption in this court of law
20 that we live in the perfect world and he'll never
21 have a complication.  So I don't include 1 million
22 to $4 million worth of care.  But let's say he does
23 have a complication, such as seizures, has to be
24 admitted, there's no money associated with the
25 admissions to the hospital.

Craig H. Lichtblau, MD - 4/8/2019

57

```
 1  well, not die.
 2    BY MR. HEDGER:
 3      Q.   So there's not a risk of, you know,
 4  obtaining a staph infection from being admitted into
 5  the hospital or other hospital?
 6      A.   There's always a risk, but it doesn't meet
 7  legal threshold of greater than 50 percent
 8  probability.
 9      Q.   Okay.
10      A.   And remember, in my thing, it's always
11  risk versus reward.
12           And in the courtroom arena, in order for
13  me to say it under oath, it's got to be greater than
14  50 percent probability.
15      Q.   While we have your old methodology in
16  front of us, let me just ask you a few questions so
17  we don't waste any time here.
18           So the third paragraph down, it says, "In
19  my medical opinion, that these costs do not take
20  into account the costs which are associated with
21  various complications."
22      A.   Right.  And that's in the section that I
23  had that I said, I'm not including 1 million and
24  $4 million worth of care because I'm going to make
25  this speculative assumption in a court of law that
```

Epiq Court Reporting Solutions - Chicago
312.386.2000

1  we live in a perfect world and -- you know, and he's
2  not going to have any problem.
3      Q.   But these are all complications that he is
4  at risk for?
5      A.   Yeah.  But, I mean, he's at risk, but it's
6  not -- doesn't meet anywhere near legal threshold.
7           (Interruption in the proceedings.)
8    BY MR. HEDGER:
9      Q.   All right.  Back to what we've marked as
10 Exhibit H.  I assume the continuation of care
11 portion is not going to change?
12     A.   No, it's not.  And you'll notice the
13 cardiology, orthopedic surgeon, gastroenterologist.
14 There's no costs included in an economic analysis
15 because it's a PRN.  The neurologist is two to four
16 times a year and PRN.  The and PRN is not included.
17 It's only two to four times a year.  But I'm not a
18 life care planner, I'm a medical doctor, and that's
19 why I write it this way.  This is complete, but yet
20 follows the rules of the court by speculation.
21     Q.   Do you know the last time -- let's start
22 with neurologist.  Do you know the last time he saw
23 a neurologist?
24     A.   I have no idea, but that's irrelevant.
25          What's relevant to me is this is what I

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PALM BEACH

     I, Shirley D. King, CRR, FPR, RPR, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of CRAIG H. LICHTBLAU, M.D.; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

     I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

     Dated this 15th day of April, 2019.

_____
SHIRLEY D. KING, CRR, FPR, RPR